**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF HAWAIʻI**

| | |
|---|---|
| MICHAEL MAEDA and RICK SMITH, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>KENNEDY ENDEAVORS, INC., a corporation; and DOES 1 through 50,<br><br>                    Defendants. | CIVIL No. 18-00459 JAO-WRP |

# EXPERT REPORT OF SARAH BUTLER

# EXPERT REPORT OF SARAH BUTLER

In connection with

Maeda v. Kennedy Endeavors, Inc.

## Table of Contents

**I.  QUALIFICATIONS**                                   2

**II.  DOCUMENTS REVIEWED**                              3

**III.  ASSIGNMENT AND SUMMARY OF OPINIONS**             4

**IV.  BACKGROUND**                                      6

**V.  SUMMARY OF DENNIS SURVEY**                         8

**VI.  DENNIS SURVEY IS BIASED**                         12
  A.  Dennis "Where" Question is Biased        12
  B.  Dennis Stimuli Images are Biased         16
  C.  There is No Control in Dennis Survey      21

**VII.  DENNIS SURVEY DOES NOT DEMONSTRATE MATERIALITY**  24

**VIII. OTHER FLAWS IN DENNIS SURVEY**                   27

**IX.  REBUTTAL SURVEY METHODOLOGY**                     28
  A.  Survey Population                         29
  B.  Sampling of the Relevant Population       30
  C.  Quality Control Measures for the Survey   31
  D.  Screening Questionnaire                   32
  E.  Preference Ranking Exercise               35
  F.  Revised Referendum Exercise               38

**X.  REBUTTAL RESULTS**                                 45
  A.  Preference Ranking Exercise               46
  B.  Revised Referendum Exercise               49

**XI.  CONCLUSIONS**                                     50

# I.    QUALIFICATIONS

1.      I am over 21 years of age and have personal knowledge of and am competent to testify to the facts set forth herein. I am a Managing Director at NERA Economic Consulting ("NERA"), where I am the Chair of the Survey and Sampling Practice and a member of the Intellectual Property, Product Liability, Antitrust, and Labor Practices. My business address is 4 Embarcadero Center, San Francisco, CA 94111. NERA is a firm providing expert statistical, survey, economic, and financial research analysis.

2.      Among my responsibilities, I conduct survey research, market analysis, and design and implement statistical samples for analysis on a wide range of topics regarding business and consumer decision making, consumer choice, and consumer behavior. In the course of my career, I have conducted research for leading corporations and government agencies on consumers, employees, and businesses. My work has been included in numerous lawsuits involving issues of false and misleading advertising, trademark and trade dress confusion, and secondary meaning, as well as in antitrust and employment-related litigation. I am a member of the American Association of Public Opinion Research, the American Statistical Association, the Intellectual Property Section of the American Bar Association, and the International Trademark Association (INTA).

3.      I have also worked as a market researcher conducting surveys, in-depth interviews, and focus groups of consumers and professionals. I have worked as an independent consultant conducting research for the Department of Environment and Rural Affairs in the United Kingdom. I have taught courses focused on or involving research methodologies in both the United States and Europe. I hold a Master's Degree from Trinity College, Dublin and another Master's Degree from Temple University.

2

4.      I have substantial experience conducting and using surveys to measure consumer opinions and behaviors regarding products and services including purchase processes, product attributes, branding and positioning, market segmentation, new product research, and communications strategies. During my career in academic and commercial research, I have personally facilitated a wide range of research including focus groups, in-depth interviews, and large-scale surveys.

5.      I have submitted expert reports, been deposed, and testified at trial within the last five years. A list of my testimony is included on the copy of my current resume, which is attached as **Exhibit A**.

6.      NERA is being compensated for my services in this matter at my standard rate of $700 per hour. Members of the staff at NERA have worked at my direction and under my supervision to assist me in this engagement. No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction and under my supervision.

## II.    DOCUMENTS REVIEWED

7.      As part of my work, I reviewed the operative Complaint[1] and the expert report of Dr. J. Michael Dennis.[2] A list of the specific materials I reviewed can be found in **Exhibit B**.

---

[1] Second Amended Class Action Complaint, *Michael Maeda & Rick Smith v. Kennedy Endeavors, Inc.,* United States District Court for the District of Hawai'i, Case No. 18-00459 JAO-WRP, dated July 17, 2019 (hereinafter, "*Complaint*").

[2] Declaration and Expert Report of J. Michael Dennis, Ph.D., dated November 28, 2020 (hereinafter, "*Dennis Report*").

3

# III.   ASSIGNMENT AND SUMMARY OF OPINIONS

8.      I was asked by counsel for Defendant, Kennedy Endeavors, to review the survey and report submitted by Dr. J. Michael Dennis. Dr. Dennis asserts that he was asked by Plaintiffs' counsel to, "understand the Products' packaging to communicate that the Products are made in the state of Hawaii," and to, "measure the extent to which (if any) the Products' packaging is material to the purchasing decisions of consumers by communicating that the Products are made in the state of Hawaii."[3]

9.      As part of my review and response to Dr. Dennis' survey, I designed and conducted a survey. My rebuttal survey corrects some of the most egregious flaws in Dr. Dennis' survey and provides unbiased results that demonstrate that manufacturing location is not seen as an important characteristic for consumers when considering which chips to purchase. Moreover, my rebuttal survey demonstrates that consumer purchasers are not influenced by a belief that the product is made in Hawaii, as my survey data yields no difference in preferences for the chips as labeled during the class period compared to chips labeled "Not a Product of Hawaii." More specifically, based on my review of Dennis' survey and my rebuttal data, I conclude the following:

- Dr. Dennis' survey does not accurately or reliably measure consumer perceptions as to the source of the product. His question asking: "Based on the product label we just showed you, where do you think the product was made?" is biased because (1) it limits respondent answer to only information that can be read on the front label of the product packaging and (2) compares the at-issue product with a geographic term in the product

---

[3] *Dennis Report*, ¶16.

4

name with only products without geographic themes or brand names. Accordingly, Dr. Dennis' question is nothing more than a reading comprehension exercise in which respondents are instructed to guess "where a product was made" based on the font of the product packaging (while simultaneously denying respondents access to the rear panel of the packaging which discloses the name and address of the producer). The question is further biased because it assumes consumers think about origin only in terms of a U.S. state.

- Dr. Dennis' "where" question is further biased in that it does not allow for multiple state responses, does not allow for any other location-type answers, and only provides a "don't know" answer if the respondent scrolls to the bottom of a list.

- Dr. Dennis also creates a biased stimulus that does not reflect the actual package and information a consumer could see in the real world. In his survey, respondents can only see the front of the package and are specifically prohibited from viewing the back of the package which clearly displays the product is made in Washington. I correctly allow consumers to look at both sides of the packaging in my revised survey.

- Dr. Dennis does not include any type of control is his survey and thus he has no way to measure the extent to which his biased question, response categories, and stimulus have affected his overall results. While his survey includes two other chip products, neither of these products make any reference to a place or a location and therefore, it is hardly surprising that respondents' answers are dispersed across a number of locations. When a proper control is included, such as the one included in my revised survey, it is obvious that consumers are *not* preferring the product because they believe it is made in Hawaii.

5

- Dr. Dennis' "referendum" question is also biased because his respondents cannot indicate that they view the products he presents equivalently or that they would not care or distinguish based on location. My survey results demonstrate that consumers do not think manufacturing location is important and my revised referendum survey allows respondents to indicate that they would not purchase either product shown, or indicate that they do not know.

10.      My results demonstrate manufacturing location is not important to consumers when considering what brand of kettle-style chips to purchase and there is no difference in purchase intent between the at-issue product label and the same product specifically labeled "Not a Product of Hawaii." My results demonstrate that when consumers are presented with an unbiased set of questions which more realistically represent marketplace conditions, beliefs that the product is made in Hawaii are not influencing consumer purchase intent.

## IV.   BACKGROUND

11.      I understand that Plaintiffs allege that Defendant Kennedy misleads consumers into believing that its chips are made in Hawaii from, "local ingredients."[4] Specifically, Plaintiffs allege that they believed the chips were made in Hawaii and, "had Plaintiffs and other consumers known that the Hawaiian Snacks are not made in Hawaii, they would not have purchased them or would have paid significantly less for them."[5]

12.      Plaintiff Maeda is a resident of Honolulu and allegedly purchased Hawaiian Kettle Style Chips in 2017 and 2018 in Hawaii and California.[6] Mr. Maeda asserts that he saw and

---

[4] *Complaint*, ¶2.

[5] *Complaint*, ¶5.

[6] *Complaint*, ¶12.

6

relied on the labeling of the product and believed he was purchasing "authentic" chips from Hawaii.[7] Mr. Smith also purchased Hawaiian Kettle Style Chips in 2017 and 2018 and allegedly relied on the package labeling, believing the snacks were made in Hawaii.[8] Both Plaintiffs allege that had they known the chips were made in Washington, not Hawaii, they would not have purchased the products or would have paid less.[9]

13.     Tim's Cascade Snacks is a Washington State-based potato chip company founded in 1986 and owned by Defendant Kennedy Endeavors, Inc., a New Jersey corporation with its principal place of business in the State of Washington.[10] In 1989, Kennedy was purchased by Curtice Burnes Foods which eventually became Birds Eye Foods.[11] Birds Eye Foods (including Tim's/Kennedy) was purchased by Pinnacle in 2009.[12] When this lawsuit was filed, Kennedy Endeavors, Inc. was a wholly-owned subsidiary of Pinnacle Foods. As of October 26, 2018, Pinnacle Foods became a wholly-owned subsidiary of Conagra Brands, Inc., a publicly traded Delaware corporation.[13] As part of Conagra's acquisition of Pinnacle Foods, Pinnacle Foods merged into Peak Finance Holdings. Pinnacle Foods, Inc. is no longer an existing business entity. In 2019, Kennedy Endeavors (which continues to operate Tim's Cascade Snacks and produce the Hawaiian Brand) was sold to Utz Quality Foods, Inc.[14]

---

[7] *Complaint,* ¶13.

[8] *Complaint,* ¶¶14, 15.

[9] *Complaint,* ¶¶13, 15.

[10] Declaration of Terri Barberi in support of Response Brief in Opposition to Plaintiffs' Motion for Class Certification (Dkt. 96), February 18, 2021 (hereinafter, "*Declaration*"), ¶8.

[11] *Declaration*, ¶11.

[12] *Declaration*, ¶15.

[13] *Complaint,* ¶16; Conagra News Release, "Conagra Brands Completes Acquisition of Pinnacle Foods," https://www.conagrabrands.com/news-room/news-conagra-brands-completes-acquisition-of-pinnacle-foods-prn-122653, October 26, 2018.

[14] *Declaration*, ¶¶17, 18.

14.     I further understand that the Granny Goose Chip Company, Inc. originally produced the Hawaiian Brand kettle potato chips in Hawaii.[15] In approximately the late 1990s, Birds Eye Foods, then the parent company of Defendant and Tim's Cascade Snacks, purchased the Hawaiian Brand from Granny Goose and transitioned production to Tim's Cascade Snacks.[16]

15.     To address its claims that consumers were misled and paid more for products than they otherwise would, Plaintiffs submitted a report from J. Michael Dennis.

## V.     SUMMARY OF DENNIS SURVEY

16.     Dr. Dennis indicates that his assignment was to: (1) determine whether the product packaging communicates that the chips are made in Hawaii; and, (2) determine whether this alleged communication is material to consumers.[17]

17.     Dr. Dennis surveyed a total of 863 consumers over the age of 18 (200 in Hawaii and 663 in California) who had purchased kettle-style chips in the last two years. Respondents qualified for Dr. Dennis' survey if they had purchased Hawaiian, Lay's, Utz, Kettle Brand, Deep River, and/or Cape Cod kettle-style chips.[18]

18.     Once qualified for the survey, respondents were shown the front packaging of three bags of chip brands: the Hawaiian brand,[19] as well as the Utz and Kettle brands.[20] An example is shown below in Figure 1.

---

[15] Defendant's Motion to Dismiss Plaintiff's Second Amended Class Action Complaint Filed on July 17, 2019; Memorandum of Points and Authorities; Declaration of David J. Minkin; Exhibit A; Certificate of Compliance; Certificate of Service, CIVIL NO. 18-00459 JAO-WRP, filed July 31, 2019, p. 1.

[16] *Declaration*, ¶¶7, 12-13.

[17] *Dennis Report,* ¶16.

[18] *Dennis Report,* ¶21 and Attachment C.

[19] Dr. Dennis tested three products: Luau BBQ, Maui Onion, and Original. *Dennis Report,* ¶21.

[20] *Dennis Report,* ¶36.

8

**Figure 1: Example of Bags Shown to Dennis Survey Respondents** [21]

Next, we are going to show you the labels of three **KETTLE TYPE POTATO CHIPS products**.

**Please take your time and view each product just like you are in a store considering a purchase.**





Please press continue when done viewing.





Please press continue when done viewing.



Please press continue when done viewing.

19. After the viewing the front of each chip bag, respondents were then asked to indicate, based on the front product label, where the product was made. To answer this question, respondents were provided with a drop-down menu listing U.S. states and the capital. At the bottom of this drop-down menu, below "Wyoming," the answer choices, "Not in USA" and "Can't say" were included. Other than a specific U.S. state and these two additional options, no other answer choices were permitted.

20. Next, respondents were told that they would be shown two chips and would be asked to indicate which they would purchase. As shown below in Figure 2, respondents were told the chips would be the same and were shown the front of the package.

---

[21] The images of each respective bag in Figure 1 were shown on separate pages. *Dennis Report,* Attachment D, pp. 37-39.

9

**Figure 2: Introduction to Dennis Purchase Question**

Chips A and Chips B have the same brand, same product size, price, and the same packaging. Here is the front of the packaging for Chips A and Chips B.



21.     After viewing the front of the package, Dr. Dennis' respondents were then asked to compare the same chips with one described as "made in the state of Washington," and one described as "made in the state of Hawaii." Respondents were shown the comparison below in Figure 3 and were asked to select which product they would purchase. Respondents needed to indicate they would purchase one of the products or could indicate that they did not know – respondents could not indicate that they were indifferent – i.e. there was no way to indicate both or neither.

10

**Figure 3: Dennis Purchase Question**

Please select the Chips you would purchase.

| | Chips A | Chips B |
|---|---|---|
| **Brand** | Hawaiian Kettle Style Potato Chips | Hawaiian Kettle Style Potato Chips |
| **Packaging** | Same  | Same  |
| **Product Size** | 8.0 ounces | 8.0 ounces |
| **Where the Chips are Made** | In the state of Washington | In the state of Hawaii |
| **Price, not including tax** | Same | Same |
| **Select one you would purchase** | ○ | ○ |
| | ○ Don't know | |

22.     Respondents were asked to confirm their purchase selection, and then the survey was complete.

23.     Based on this survey design, Dr. Dennis concludes that "reasonable consumers in both California and Hawaii understood the Products' packaging to mean that the Products are made in Hawaii,"[22] and that, "Defendant's packaging, with respect to communicating that the

_____

[22] *Dennis Report*, ¶22.

11

Products are made in Hawaii, was material to the purchasing decisions of reasonable consumers."[23]

24.    Dr. Dennis' survey is biased, does not replicate marketplace conditions, and provides no actual evidence as to the materiality, if any, associated with the brand of chips being made in Washington, rather than Hawaii. My rebuttal survey which corrects many of the flaws and biases of Dr. Dennis' survey demonstrates the manufacturing origin and purported beliefs that the product is from Hawaii do not impact consumers' interest and willingness to purchase the Hawaiian kettle-style chips.

## VI.    DENNIS SURVEY IS BIASED

25.    As designed, Dr. Dennis' survey is biased and is his results are predicated on numerous assumptions as to what features or characteristics consumers consider when purchasing products such as potato chips.

### A.    Dennis "Where" Question is Biased

26.    First, Dr. Dennis assumes that consumers consider and evaluate where products like potato chips are made. Dr. Dennis' survey does not ask open-ended questions or filter questions to evaluate what consumers perceive in their own words and he does not ask consumers to evaluate a range of features that could potentially impact their purchasing behaviors. And, although Dr. Dennis purportedly conducted "probing" "cognitive interviews" with eight subjects to test his survey, he did not record or take any notes from those interviews, nor did he retain those eight subjects' survey responses.[24] As a result, the record is devoid of any documentation

---

[23] *Dennis Report,* ¶23.

[24] Deposition of J. Michael Dennis, dated December 30, 2020, (hereinafter "*Dennis Deposition*"), 84:24-87:16. As described below, I conducted a pre-test with ten participants and produce the moderator script and the interview transcripts.

that Dr. Dennis' survey respondents understood his questions, and there is no information that any of his participants felt his question about manufacturing origin was relevant or complete.

27.     In contrast to Dr. Dennis' limited and biased questioning about manufacturing origin, there is substantial evidence demonstrating that other factors influence purchasing behavior. For example, Plaintiff Maeda agreed in his deposition that there are a number of reasons that motivate consumers to purchase potato chips. He concluded that without asking other consumers why they purchase specific kinds of chips, it is impossible to know the motivating factors that exist.[25] When further asked what aspects of a chip motivate *him* to purchase, he cited flavor, texture, and thickness of the chip being his top "motivating factors."[26] Later, when directly asked if there were any other variables that were important to him when purchasing potato chips, he explicitly stated that there were not.[27] My own survey data indicate that characteristics such as price, flavor, brand, and package size are those seen as important by consumers considering which kettle-style chips to purchase; manufacturing location is rated the least important feature by a large majority of respondents.

28.     Dr. Dennis incorrectly assumes that the manufacturing location is a relevant product characteristic for consumers of kettle-style chips. He further compounds this bias by providing answer choices which assume the respondent conceptualized "where" the product was made as a U.S. state. Even assuming respondents viewed the front label (Dr. Dennis does not allow consumers to view the back of the package) as conveying some specific information about manufacturing location, there is no reason to assume that the "where" necessarily equates to a

---

[25] Deposition of Michael Maeda, dated August 3, 2020 (hereinafter "*Maeda Deposition"*), 80:7-83:4.

[26] *Maeda Deposition,* 84:3-15.

[27] *Maeda Deposition,* 85:10-14.

U.S. state. By limiting responses in this way, Dr. Dennis signals that the only acceptable answer to "where" the product is made is a U.S. state. Therefore, Dr. Dennis' questionnaire simply encourages respondents to guess whatever state seems most reasonable. Such guessing does not indicate that a respondent believes the product is actually made in Hawaii, but rather demonstrates that in response to a close-ended question, with a limited set of answers, individuals can read the package and understand what answer the researcher is looking for them to provide. A close-ended question with biased response options which do not reflect the full range of possible answers cannot provide any reliable information as to how the label is actually perceived by relevant consumers.

29. The state-based drop-down box is further problematic in that there is no way a respondent would know that she can provide a "Can't say" response unless she scrolls all the way down in the listing to "North Dakota." As shown below in Figure 4, Dr. Dennis' question does not indicate that respondents can say they don't know or indicate that they have no opinion, and the "Can't say" option is only visible when the drop-down menu is scrolled down to "North Dakota" and the states at the end of the alphabet.

14

**Figure 4: Dennis Location Question and Drop-Down**





30.     Dr. Dennis' drop-down box is further faulty as this format assumes that all respondents, even when limited to U.S. states, would only pick a single location. Of course, it is possible that respondents may believe the product is made in multiple locations or may believe that the product was originally made in Hawaii, but now is made in another place or places. There is no way to determine, given Dr. Dennis' questionnaire, what share of his respondents were

15

simply guessing, what share might have offered more than one location, or what share might have said don't know or no opinion had they been asked an unbiased question.

31.     Dr. Dennis' phrasing of this questions renders bias particularly likely with regard to the Hawaiian Brand chips. As discussed above, the Hawaiian Brand chips were originally made in Hawaii by the Granny Goose Chip company. Granny Goose then made the Hawaiian Brand in California before selling the Hawaiian Brand to Birds Eye which began producing it at the Tim's Cascade Snacks facility in Algona, Washington.[28] By phrasing the questions vaguely and in the past tense – "where do you think the product _was_ made"[29] (emphasis added) – it is unclear to the respondent whether Dr. Dennis is enquiring about the current physical manufacturing location of the product or the historical Hawaiian origin of the product line. This is particularly problematic when surveying consumers from Hawaii, a subset of whom are almost certainly aware of the Hawaiian Brand's legitimate Hawaiian heritage and likely answered the question based on that knowledge. In short, given the lack of clarity in the question presented, Dr. Dennis' data is meaningless.

## B.     Dennis Stimuli Images are Biased

32.     Dr. Dennis asserts that his survey was designed to determine whether consumers, "understand the Products' packaging to communicate that the Products are made in the state of Hawaii."[30] But Dr. Dennis does not test the entirety of packaging and only allows respondents to see the front of the package. In other words, even if Dr. Dennis' survey was reliable in other ways

---

[28] _Declaration_, ¶¶7-8, 13.

[29] _Dennis Report_, ¶46.

[30] _Dennis Report_, ¶16.

(which it is not), it cannot be used to determine what impressions consumers would actually have of Defendant's products and product labeling in the real world.

33.     Only providing respondents in a survey with a limited portion of the stimulus, particularly when the omitted portion could change the results, is grounds for the survey to be excluded. As explained by one author,

> Whether characterized as the display of an improper stimulus or as the failure to replicate marketplace conditions, a false advertising survey that showed survey respondents only part of the product in question led one court to find that the survey "sheds no light" on the question at issue.[31]

34.     In this particular matter, Dr. Dennis does not allow respondents to view the back of the packaging, which clearly includes the place where the chips are made. A fair representation of the product would have included all information available to a consumer when actually purchasing the product in the store.[32] An example of the front and back of the packaging is shown below in Figure 5. In my rebuttal survey, I provided respondents with both the front and back sides of the packaging.

---

[31] Edwards, G. K. (2012). The Daubert Revolution and Lanham Act Surveys. In Diamond, S. S., & Swann, J. B. (Eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design.* American Bar Association, Section of Intellectual Property Law, p. 347.

[32] Products purchased online also often show the front and back of package and include information as to where the potatoes are grown, or where the product is manufactured. https://www.amazon.com/Hawaiian-Kettle-Style-Potato-Original/dp/B00FUAZI4S.

**Figure 5: Example of Front and Back Side of Product Packaging**





• **No Artificial Colors**
• **No Preservatives**

## Nutrition Facts

about 8 servings per container
Serving size 1oz (28g/about 17 chips)

**Amount per serving**

## Calories 140

| | % Daily Value* |
|---|---|
| **Total Fat** 8g | **10%** |
| Saturated Fat 1g | **5%** |
| Trans Fat 0g | |
| **Cholesterol** 0mg | **0%** |
| **Sodium** 115mg | **5%** |
| **Total Carbohydrate** 18g | **7%** |
| Dietary Fiber 3g | **11%** |
| Total Sugars 1g | |
| Includes Less than 1g Added Sugars | **2%** |
| **Protein** 2g | |
| Vitamin D 0mcg | 0% |
| Calcium 0mg | 0% |
| Iron 0.4mg | 2% |
| Potassium 320mg | 6% |

*The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

**INGREDIENTS: POTATOES, VEGETABLE OIL (CORN OIL AND/OR SUNFLOWER OIL), SUGAR, SALT, TORULA YEAST, SPICE, PAPRIKA, ONION AND GARLIC POWDER, NATURAL FLAVORS (INCLUDING SMOKE), WHEAT FLOUR, CITRIC ACID, EXTRACTIVE OF PAPRIKA.**

**CONTAINS: WHEAT**

### HAWAIIAN
KETTLE STYLE POTATO
LUAU BBQ

Discover a new world of flavor when you crunch into these crispy golden chips. Created one batch at a time to deliver the freshness and authenticity only found in Hawaiian Style Chips. Cooked to perfection and seasoned to give the authentic taste that only an open fire barbeque can give you.

Open a bag of Hawaiian Style Potato Chips, and let yourself be swept away to a tropical paradise of beautiful sunset luaus. *Mahalo.*

### TIM'S

1100 Industry Drive North
Algona, WA 98001
1-888-910-3747
www.hawaiianbrand-snacks.com

Visit us on
Facebook
www.facebook.com/hawaiianbrandchips

19

35.     The importance of fairly representing the product packaging is particularly true in this matter. In fact, both Mr. Maeda and Mr. Smith, the named Plaintiffs and putative class representatives in this lawsuit, have admitted that it is "common knowledge" that consumers can turn to the back of a food label to identify the manufacturing location of a product.[33] Thus, by denying survey respondents access to the rear panel – which clearly identifies the Algona, Washington manufacturing facility for the products-at-issue – Dr. Dennis' survey deprives respondents of critical information that would have been available to them in an actual grocery shopping scenario.

36.     Indeed, it appears Dr. Dennis recognized the significance of the rear panel when designing his study. Dr. Dennis testified that he utilized Emily Bishop at South Yard, a third-party graphic designer, to help make the Hawaiian Brand images used in his survey "more visually attractive to the respondents."[34] Notably, an October 14, 2020 email from Dr. Dennis to Ms. Bishop states, in relevant part: "The task is to create back panel images for the three [Hawaiian] chips products from the three PDFs that I sent you."[35] The next day, Ms. Bishop emailed Dr. Dennis images of the Maui Onion flavored chips, and Dr. Dennis responded, "For just the curved FRONT and curved BACK, can you set the background to white (instead of the off white/gray [i]t is now) … Charge me for the work!! The pics look awesome!!!"[36] Thus, Dr. Dennis instructed his designer to create rear images of the subject products and received those images, but did not include these images as part of his survey.

---

[33] Deposition of Rick Smith, dated August 4, 2020, (hereinafter "*Smith Deposition*"), 130:15-21; *Maeda Deposition*, 123:20-124:6.

[34] *Dennis Deposition*, 25:7-14. Notably, Dennis was uncertain whether similar manipulation was conducted on products other than the Hawaiian Brand chips.

[35] See, 10/14/20 email from Dr. Dennis to Ms. Bishop (attached hereto as **Exhibit J**).

[36] See, 10/15/20 email chain between Dr. Dennis and Ms. Bishop (attached hereto as **Exhibit K**.).

## C.  There is No Control in Dennis Survey

37.      In addition to testing only the front of the Hawaiian chips package, Dr. Dennis also tests the front packaging or two other products in his survey – Utz and Kettle Brand. Dr. Dennis says the results from these products "corroborate" his finding that, "Defendant's packaging is distinguished by its efficacy in communicating a message of a specific state where the kettle chips are made."[37] To inform this conclusion, Dr. Dennis indicates that 31.2 percent and 30.9 percent of respondents, respectively, could not determine where the Utz and Kettle Brand chips were made, and less than 5.0 percent of respondents selected the correct states for these brands.[38]

38.      It is not entirely clear why Dr. Dennis believes the comparison he has created is relevant in any way. His comparison groups are not characterized or used in his analysis as "controls." A control group in a survey is particularly important by helping the researcher measure and determine the extent to which respondents are guessing, inattentive, or are influenced by the survey design or other aspects of the stimulus shown that are not at issue. The Utz and Kettle brand chips are not controls in Dr. Dennis' survey.[39] If anything, these results demonstrate that when provided with images of packaging fronts that include no reference to any place or location whatsoever, respondents will guess an origin from the list of provided states. This design does not "corroborate" anything other than the fact that Dr. Dennis has constructed a

---

[37] *Dennis Report,* ¶54.

[38] *Dennis Report,* ¶54.

[39] Even if Dr. Dennis were to try and reframe these other products as "controls," they would be entirely insufficient. A flawed and unreliable control is no helpful, and "[i]n fact, courts may give little or no weight to surveys with improperly constructed control groups. A good control should match the tested advertisement as close as possible in every respect other than the aspect of the test stimulus that is alleged to contain the misinformation." *See* Keller, B. P. (2012). Survey Evidence in False Advertising Cases. In Diamond, S. S., & Swann, J. B. (Eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design.* American Bar Association, Section of Intellectual Property Law, p. 185.

21

reading test which can effectively steer respondents to select Hawaii from a list of states when shown a package with the word "Hawaii."

39.     Dr. Dennis' irrelevant comparison products do not function as controls and provide no data on the extent to which, given his biased design, respondents are likely to guess a location when presented with a label that has some geographic reference. Dr. Dennis could have easily selected from a wide array of food products that reference geographies and used any of these products as comparators. In fact, he could have selected another snack or chip product that referenced a location or area as a measure of the extent to which consumers were simply reading the label and were guessing or attempting to provide the researcher the desired response. Examples of products with geographic references in the brand or product name are shown below in Figure 6.

**Figure 6: Examples of Products with Geographic / Place Names**



40.     Testing other products with labels that include a name of a place or geography could have provided an understanding of the extent to which respondents were simply guessing or were influenced by Dr. Dennis' questionnaire design. Aside from using other products, Dr. Dennis also could have tested a different control with a separate, randomly selected group. In this way, the test group respondents would have viewed the actual product label, and the control

group would have seen an altered version of the Hawaiian packaging with changes to the label. I use this design in my rebuttal survey.

41.     Given the extreme bias of Dr. Dennis' questions, there is no way to determine what share of his respondents actually believe the product is made in Hawaii and what share are simply guessing or are responding to the poorly constructed questions and limited view of the stimulus.

## VII.  DENNIS SURVEY DOES NOT DEMONSTRATE MATERIALITY

42.     Dr. Dennis' simplistic referendum-type question is also flawed and biased and provides no information as to the extent to which, if at all, consumers would view the place that the chips were made as a material factor in their purchasing decision. In fact, Dr. Dennis himself acknowledged that it is entirely possible that some consumers may not care about where a product is made when deciding whether or not to make a purchase. In his deposition, he explicitly agreed with the idea that "a majority of consumers" are likely not interested in where a product manufactured,[40] a point which he reinforced on several occasions throughout the deposition.[41] My own survey data show that manufacturing location is the least important feature of chips by purchasers of kettle-style chips.

43.     By the very nature of its design, Dr. Dennis' question can only demonstrate whether chips made in Hawaii, relative to the exact same chips made in Washington, are preferred. This question offers no insight as to the import (or lack thereof) of the origin of the chip relative to any other product features. Dr. Dennis does not ask respondents which factors

---

[40] *Dennis Deposition*, 140:9-22.

[41] *Dennis Deposition*, 52:23-54:3; *Dennis Deposition*, 138:3-11.

influence their chip purchases and does not ask consumers to evaluate which product features actually matter in selecting a snack product to purchase. Even a cursory examination of customer reviews and descriptions of the products demonstrates that consumers focus on things like taste, available flavors, saltiness, crispiness, spices, price, and how they are cooked.[42] These reviews are confirmed by my data indicating that price, flavor, brand, and package size are the characteristics important to consumers.

44.     The idea that many aspects of a product matter to consumers is supported by Dr. Dennis in his deposition, where he mentioned taste, price, and texture as important factors when buying potato chips (though, not once did he note the origin of the product as being of personal importance).[43] This supports the notion that materiality should be a measure of the *many* factors that could influence purchasing behavior.[44] By Dr. Dennis' own admission, "there are any number of attributes that could drive choice to varying degrees."[45] Dr. Dennis' referendum question, then, even if designed appropriately (which it was not), cannot demonstrate that "Hawaiian" was a material factor in any purchasing decision because there is no measure of any other factors which may have been far more important.

45.     As with his question of where the chips are made, Dr. Dennis' referendum question is biased. Referendum-type questions have faced substantial criticism in the survey literature as an approach which yields inflated estimates of the value attributable to the feature

---

[42] https://briteandbubbly.com/hawaiian-kettle-style-potato-chips-review/; https://thechipreview.com/review-hawaiian-sweet-chili-potato-chips/; https://www.influenster.com/reviews/hawaiian-sweet-maui-onion-potato-chips-18oz; https://hotsaucedaily.com/hawaiian-kettle-style-chips-mango-habanero-review/; https://www.youtube.com/watch?v=JaJ3u8fT7aY; https://www.youtube.com/watch?v=TVf-lWmJBAQ.

[43] *Dennis Deposition*, 55:2-18.

[44] *Dennis Deposition*, 73:8-17.

[45] *Dennis Deposition*, 153:2-10.

25

being evaluated.[46] While in this case, Dr. Dennis does not include a price or monetary estimate of value, he is still relying on his results to opine that where the chips are made has some level of importance that is significant enough to claim it is material. Furthermore, while Dr. Dennis attempts to defend his use of the referendum survey question,[47] the contingent valuation methods that Dr. Dennis cites as the basis for his design have "been at the center of a brooding controversy for many years."[48] In critique of the very report cited by Dr. Dennis, one economist noted that "[d]espite the impressive pedigree of the authors, the report is found to be generally lacking in logic and empirical foundation."[49]

46.     As described above, Dr. Dennis' referendum question does not demonstrate that the origin of the chips is material, and unbiased, properly framed questions demonstrate this is not important to consumers. Dr. Dennis simply assumes that where the chip is made is relevant to all of his survey respondents (or more egregiously, only those who say the product is made in Hawaii) and then only asks them to compare two possible locations. The poor design choice selected by Dr. Dennis is further marred by a bias question which only allows respondents to indicate they prefer a product made in one location over the other. While respondents can indicate they "don't know," they cannot indicate that they would not be interested in purchasing either product, nor can they indicate that they are indifferent between the two. Again, Dr. Dennis assumes that origin has an impact and he simply needs to measure "how much."

---

[46] Harrison, G. W. (2002). "Contingent Valuation Meets the Experts: A Critique of the NOAA Panel Report." *Environmental and Resource Economics* (hereinafter, "*Harrison*").

[47] *Dennis Report*, ¶50.

[48] *Harrison*, p. 1.

[49] *Harrison,* title page.

47.     Dr. Dennis' referendum question is also biased due to context effects. The question asking whether one of two locations matters follows the question, which signals to respondents that "where" the chips were made is important. Further, the only respondents answering the question as to the importance of Hawaii versus Washington are those who selected Hawaii as the source from the drop-down list. Respondents who understood that the researcher was looking for a state and selected Hawaii were highly likely to understand that the "best" answer would be to select the chips made in Hawaii in the referendum question.

48.     The influence of the prior question is evident in the data. When I examine respondents who said the product was made in a state other than Hawaii, less than half, or only 41 percent, indicated that they would select the product made in Hawaii over the product made in Washington.[50] While Dr. Dennis suggests that such patterns in the data indicate the "materiality" of the origin, they could just as easily indicate that due to context effects and a biased survey, respondents were attempting to provide consistent answers to what was asked for by the researcher.

## VIII. OTHER FLAWS IN DENNIS SURVEY

49.     Aside from the biased questions throughout the survey and the fact that the survey does not actually measure any material impact of the labeling, there are additional problems with Dr. Dennis' research.

50.     While Dr. Dennis asserts he conducted cognitive interviews with eight respondents, he provides no record of these interviews, no script for what respondents were asked,

---

[50] This was calculated using Dr. Dennis' data, by taking the 53 total respondents who 1.) believed that the product was made somewhere other than Hawaii, and who 2.) indicated that they would select the product made in Hawaii, and dividing this by the total 129 respondents who believed that the product was made somewhere other than Hawaii.

and no actual documentation as to who was recruited and what responses they provided.[51] In contrast, I provide the moderator script and verbatim records of the pre-test interviews I conducted.[52]

51.      Further, Dr. Dennis' 42 "pre-test" interviews with respondents simply represent an initial set of data collection using his actual questionnaire. While Dr. Dennis may have been able to evaluate these initial data to determine if there were programming errors in the survey, there is no way these initial data could provide insight as to how consumers understood the questions, what they believed the goal of the exercise to be and how they interpreted the "where" and referendum questions, and whether there were other factors that would have been influential in their purchasing decision.

52.      Dr. Dennis also heavily oversampled older respondents age 50 years and older. Dr. Dennis reports that 48.4 percent of the interviewees were aged 50 years or older;[53] however, by my calculations, his population in this age demographic is actually much larger, at 63.2 percent.[54] My research sampled respondents much more appropriately, with only 20.4 percent of respondents being 50 years or older.

## IX.   REBUTTAL SURVEY METHODOLOGY

53.      As indicated above, I conducted my own survey to determine the importance, if any, consumers place on manufacturing origin and the extent to which, if at all, consumer

---

[51] *Dennis Deposition,* 84:24-90:14.

[52] See **Exhibits C** and **D**, respectively, for the moderator script and transcripts of the pre-test interviews.

[53] *Dennis Report*, ¶58.

[54] See **Exhibit F**.

preference is materially impacted by the at-issue label. The survey I conducted provides an unbiased evaluation of the materiality, if any, associated with the product label.

54.    The design of my research follows the generally accepted principles for the design of surveys to be used as evidence in litigation.[55] In general, the design of a reliable survey requires careful attention to the following key areas:

- The definition of the relevant population;

- The procedures for sampling from the relevant population;

- The survey questions used;

- The stimuli used; and

- The protocol for calculating the results from the survey.[56]

55.    The discussion of the survey I conducted is organized around each of the key areas.

## A.    Survey Population

56.    I understand that the putative class includes Californian or Hawaiian consumers 18 years or older who purchased the Hawaiian kettle-style chips kettle chips during the class periods (October 12, 2012 to December 31, 2019 for the Hawaii class and October 12, 2015 to December 31, 2019 for the California class). To ensure that my population is the same population

---

[55] Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence,* Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 361-423. (hereinafter "*Diamond*"); *Manual for Complex Litigation, Fourth Edition*. Federal Judicial Center 2004, Section 11.493. (hereinafter "*Manual for Complex Litigation, Fourth Edition*") p. 102.

[56] The *Manual for Complex Litigation, Fourth Edition* phrases these key areas as such (*see* p. 103):

"• the population was properly chosen and defined;
• the sample chosen was representative of that population;
• the data gathered were accurately reported; and
• the data were analyzed in accordance with accepted statistical principles."

29

that Dr. Dennis sampled,[57] I screened to respondents who had purchased kettle-type potato chips in the past 24 months.

## B.      Sampling of the Relevant Population

57.      Potential survey respondents were contacted using an Internet panel hosted by Veridata Insights.[58] Veridata is a firm founded by well-respected survey professionals I have worked with many times in the past for litigation surveys. Veridata programmed the web-based survey instruments, hosted and collected the data. Survey invitations for my survey were sent to Veridata panel members in the respective states. Respondents who initiated the survey were first asked a series of screening questions to ensure that they qualified as part of the relevant population for my study.

58.      To ensure that the survey I created was clear and represented realistic choices for respondents, I conducted and recorded a series of individual pre-test interviews. I recruited ten participants to complete the survey. Pre-test respondents completed the survey online via their own unique one-time use survey link on their own computer while on a video conference with the interviewer. After completing the survey, the interviewer asked the respondent a series of post-survey debrief questions. Unlike Dr. Dennis, I have provided the moderator script, and recorded transcripts from these interviews in **Exhibit D**. As demonstrated in these materials, I asked participants specific questions to determine whether the survey was clear, whether manufacturing location was described clearly, and whether the images presented were realistic. Participants confirmed that they understood manufacturing location, that the features were described clearly

---

[57] My survey included a question to determine whether respondents had, in the last 30 days participated in a survey related to snack foods. Anyone who indicated that they had recently completed such a survey was screened out and therefore, I have ensured that there is no overlap in respondents who took Dr. Dennis' survey and the survey I conducted.

[58] For additional information about Veridata's online surveys, *see* Veridata Insights Value Statement.

and that the product images presented were realistic. Once I confirmed there were no issues with the questionnaire as designed, I began fielding the full study.

59.     Data for the survey, including the pre-test responses, were collected between January 25, 2021 and February 12, 2021. A total of 905 respondents qualified (based on the survey population parameters described below) and completed the survey. My final sample includes responses from 602 California residents and 303 Hawaii residents.

## C.     Quality Control Measures for the Survey

60.     I had Veridata collect the data for the full survey. Veridata uses a variety of quality control measures to ensure the reliability and integrity of the responses it provides. For example, Veridata uses digital fingerprinting, proprietary software to identify duplicate respondents, internal and third-party data validation, and automated checks of inconsistent or illogical respondent behavior. These precautions are designed to prevent unqualified respondents from being included in the survey and were put into place in this survey.

61.     To ensure that my data are of the highest quality, I implemented quality control measures in addition to those undertaken by Veridata:

   a. As is standard survey practice for litigation, the surveys were conducted in a "double-blind" fashion; that is, neither the staff at Veridata nor any of the respondents were aware of the survey's sponsor or the ultimate intention of the survey.[59]

---

[59] *Diamond*, pp. 410-411.

b. Respondents had to correctly answer a CAPTCHA question to ensure that a person, and not a computer or "bot," was taking the survey.[60]

c. Each respondent was required to enter their gender and age at the outset of the survey, and if these data conflicted with the age/gender information on file with Veridata, the respondent was excluded.

d. Respondents were required to take the survey on a laptop/desktop, tablet, or mobile device to ensure that they would be able to easily see and review the chip bags shown.

e. Any respondent who indicated that they had taken a survey on snack food products in the last 30 days was disqualified from the survey. This ensures that respondents in my survey were not somehow inadvertently affected by research conducted in some other matter related to snacks.

f. The survey was tested, and the initial results were reviewed to ensure that there were no errors in the programming and that respondents were able to understand and answer the questions as asked.

## D.    Screening Questionnaire

62.    To ensure that the respondents were part of the relevant population as defined above, a series of screening questions was asked.[61] First, respondents were asked whether they had taken a survey on any of the following topics in the last 30 days: hair care products, toothpaste/oral care, sporting goods or outdoor gear, advertisements on TV, beverage products,

---

[60] Captcha uses advanced software to tell humans and bots apart. For a description of the technology, see http://www.captcha.net/, accessed February 11, 2021.

[61] The questionnaire can be found in **Exhibit C.**

32

snack food products, skin care products, vitamins/dietary supplements, clothing, websites visited, or video games. Any respondent who indicated that they had completed a survey on snack food products in the past 30 days was screened out.

63.     As indicated above, the screener used includes the same set of questions Dr. Dennis included to ensure that the results are comparable. Potential respondents were asked to select from a list of snack foods which, if any, they had purchased in the past 24 months. Respondents were allowed to select from a list of the following: chips, cookies, crackers, nuts, trail and snack mixes, pretzels, popcorn, fruit snacks, dried fruit and raisins, granola and cereal bars, jerky and meat sticks, apple sauce and fruit cups, gelatin and pudding, salsa and dips, and snack cakes. Respondents could also indicate that they had not purchased any of these snacks at all. Respondents who did not indicate that they had purchased chips for personal consumption in the past 24 months were screened out.

64.     As with Dr. Dennis' survey, potential respondents in my survey were provided with a list of chip types and asked which, if any, they had purchased in the past 24 months. The question emphasized that this was a list of types of chips, not brands. For each of the listed chip types, respondents indicated "Yes" or "No" to having purchased the type(s) in the past 24 months: kettle potato chips, regular potato chips, potato chips stackable in tubes, puffed snacks, tortilla chips, and snack mixes. Respondents who had not purchased kettle potato chips in the past 24 months were screened out.

65.     Respondents were next ask to select from a list of chip *brands* which, if any, they had purchased in the past 24 months. Again, comparable to Dr. Dennis' survey, the list included: Lay's Kettle Cooked, Cape Code Kettle Cooked Potato Chips, Hawaiian Kettle Style, Kettle

33

Brand Potato Chips, Utz Kettle Classics, Wise Kettle, and Deep River. Respondents were allowed to proceed if at least one brand was selected "Yes."

66.     For each brand respondents had reported purchasing in the past 24 months, respondents were then asked when they had first started purchasing the brand. Response options included: less than 12 months ago, 12 months to 24 months ago, more than 24 months but less than 5 years ago, and 5 or more years ago.

67.     For respondents who had reported purchasing more than one brand in the past 24 months, they were then asked which of their selected brands they had purchased the most often in the past 24 months. Only the brands which had been previously been indicated as purchased were available for selection.

68.     Respondents were then asked where they usually purchased their kettle-type potato chips in the past 24 months. Response options included: grocery stores, drug stores/pharmacies (like CVS, Walgreens), big-box retail stores (like Walmart, Target), convenience stores / gas stations, warehouse club stores (e.g., Costco, Sam's), or somewhere else.

69.     Finally, respondents were shown a screen that stated, "This survey asks consumers about KETTLE-TYPE POTATO CHIPS." After proceeding to a new screen, respondents were asked, "Please confirm your understanding of this survey. **What is this survey about?**" Response options included: mixed snacks, kettle-type potato chips, corn chips, pretzels, popcorns, and don't know. This question was asked to screen out respondents who might not be paying attention to the survey. Respondents who selected incorrectly were screened out.

70.     Qualified respondents were then taken to the main portion of the questionnaire, where they completed the preference ranking (MaxDiff) exercise.

## E.    Preference Ranking Exercise

71.    The research I conducted stands in marked contrast to Dr. Dennis' survey. Rather than ask biased questions, I designed a test to understand the importance consumers place (if any) on manufacturing location within the context of all of the other factors that might influence a purchase decision. Such an approach is appropriate of materiality because it allows me to evaluate the importance of manufacturing location in consumers' purchasing decisions as compared with other factors that are known to be important purchase drivers for consumers when selecting chips.[62]

72.    To measure the impact of the manufacturing location on consumers' preferences relative to the impact of other components of the kettle chips features making up the product as a whole (*e.g.* brand familiarity, new or familiar flavors, nutritional content, accommodation of dietary restrictions, etc.), I designed and implemented a choice-based survey known as a "Maximum Difference" (or "max-diff") exercise.[63] A max-diff survey is a well-known research methodology used to evaluate the relative importance of product features or attributes.[64] Although there are different variations, broadly speaking max-diff studies involve asking respondents to review small subsets of features or attributes and indicate which feature is the most and least preferred of each subset. Respondents are presented with a series of such exercises, with the set of features varying each time, allowing the researcher to deduce a rank ordering of importance for all of the items in the survey.

---

[62] See, e.g., Exhibit L.

[63] See, e.g., Sawtooth Software, Inc. (2013) The MaxDiff System Technical Paper, Version 8. https://www.sawtoothsoftware.com/download/techpap/maxdifftech.pdf, accessed January 9, 2017.

[64] The approached was pioneered by Jordan Louviere. For a recent discussion, *see* Flynn, T. N. & Marley, A. A. (2014). "Best-Worst Scaling: Theory and Methods," *Handbook of Choice Modeling*, pp. 1-29 at p. 4.

73.     Max-diff surveys are generally superior to other rank order approaches because the exercises are generally thought to be easy for respondents to complete and the method capitalizes on the natural, human tendency to evaluate features at the extremes. Such an approach also helps avoid answers from respondents who would indicate that all features shown are similarly important. Finally, this approach avoids the problem of having a respondent rank order a large list of features, which often yields little useful information about the attributes that fall in the middle (neither the most nor least important) range of the scale.

74.     In this max-diff exercise, respondents were presented with a series of twelve questions called "tasks." In each task, respondents were presented with a randomly selected set of six features from the set of fourteen[65] and asked to select their "most important" and "least important" option. This was designed following recommended settings in Sawtooth, such that each item would appear 3 to 5 times for each respondent.[66]

75.     At the start of the max-diff exercise, respondents were presented with the following instruction:

> Now, we will ask you about KETTLE TYPE POTATO CHIPS. There are no right or wrong answers. We just want your honest opinions. In answering our survey questions, please consider only the product labels and descriptions we show you.
>
> Because we want you to take your time, you might need to wait a few seconds before going to the next screen or question.

76.     In the following screen, respondents were instructed:

> In the next questions, you will be shown several sets of descriptors for KETTLE TYPE POTATO CHIPS products.

---

[65] As described in **Exhibit L**, the features included in the survey were primarily identified in a Mintel Group market report. Four other features ('Package size,' 'Gluten free,' 'Manufacturing location,' and 'Kosher') were also included.

[66] The suggested number of questions is based on the formula 3K/k to 5K/k, where K is the total number of items and k is the number of items shown per set. Sawtooth Software. Lighthouse Studio v9.9.2.

For each set, you will be asked to select the product description that is <u>MOST important</u> when considering KETTLE TYPE POTATO CHIPS products, and the product description that is <u>LEAST important</u>.

77.      Figure 7 is an example of how a task would appear to the respondent. Further examples of how a task would appear to a respondent may be found in **Exhibit E**.

**Figure 7: Example of One MaxDiff Choice Task**



78.      As noted above, the preference exercise was repeated twelve times, with twelve different, randomly selected sets of descriptors. After completing the preference exercise, respondents proceeded to the referendum exercise.

## F.    Revised Referendum Exercise

79.    As described above, there are numerous biases and limitations with a referendum type question, particularly the exercise as designed by Dr. Dennis. In particular, Dr. Dennis' referendum exercise is completely divorced from a realistic purchasing context, assumes the importance of manufacturing location, and has no control for the numerous biases that undermine his results. To address these concerns and demonstrate the unreliability of Dr. Dennis' survey, I have modified his referendum exercise. Importantly, my referendum exercise allowed respondents to view both sides of the package, utilized a randomized experimental design, and included an additional product to ensure the purchasing question was more realistic. The revised exercise is described in detail below.

80.    Prior to beginning the referendum exercise, respondents were randomly assigned to either a test or control condition. Respondents in the test condition were shown images of both the front and the back of the Hawaiian Kettle Style Potato Chips product label at issue. Thus, unlike Dr. Dennis' survey, respondents could view all information about the product as they could if they were actually making a purchase.

81.    Respondents in the control condition were assigned to view the same Hawaiian Kettle Style Potato Chips product label, but which had been altered to include an enlarged disclaimer stating, "NOT A PRODUCT OF HAWAII."

82.    Unlike Dr. Dennis' survey, the test and control design I have used ensures that I can measure consumer preferences for the at-issue product relative to a product which clearly indicates it is not made in Hawaii, holding everything else constant. In other words, in my survey, I can directly measure the influence of the at-issue label because any and all of the other factors that might influence consumer preferences for the Hawaiian brand kettle chips are held constant

38

between the two groups. Moreover, using a control group also ensures that I hold constant any influence the survey design or questions may have on consumer preferences. Again, Dr. Dennis has no such control and cannot disentangle his measure of purported preference from a biased and leading survey design.

83.     I also, unlike Dr. Dennis, included a different brand of chip in the referendum exercise to more closely mirror how consumers actually encounter products in the real world. In addition to the Hawaiian Kettle Style Potato Chips product (either test or control), all respondents were shown Kettle Brand chips.[67] Prior to viewing the product packaging, respondents were instructed,

> In the next questions, we are going to show you the labels of two KETTLE TYPE POTATO CHIPS products.
>
> Please take your time and view each product just like you are in a store considering a purchase.
>
> You may click or tap to enlarge the images but will need to close out of the enlargement to answer the next questions.

On a new screen, the instructions continued,

> Suppose you are going shopping for kettle-style chips at the place where you normally buy such products.
>
> We are going to show you two kettle-style chips – Chips A and Chips B – and ask you which of the two you would buy.
>
> It might take a few seconds before you will be able to see the next screen.

84.     Respondents were then shown an image of either (A) Hawaiian Kettle Style Potato Chips product (either test or control) or (B) Kettle Brand Chips. The order of the product appearing as Chips A versus Chips B was randomly rotated. As noted above, respondents were

---

[67] Dr. Dennis included this brand as a relevant comparator in his survey when asking about manufacturing location.

shown the front and back of the product package as this more closely replicates market

conditions. In addition, respondents were instructed that they could click to enlarge the images to

view any aspect of the label more closely. This functionality was not a part of Dr. Dennis' survey.

After displaying each image, there was a ten-second delay before the respondent was able to

continue to the next screen. Figures 8-10 are examples of how the product labels would appear to

a respondent. Further examples may be found in **Exhibit E**.

**Figure 8: Screenshot of Stimulus - Test**



40

**Figure 9: Screenshot of Stimulus - Control**

Survey Support                Progress �In Progress▮ 91% Complete

Here is the front and back of the packaging for Chips A.



*Click image to enlarge*          *Click image to enlarge*

**Figure 10: Screenshot of Kettle Chip Image**

Survey Support                Progress ▮▮▮▮▮▮ 93% Complete

Here is the front and back of the packaging for Chips B.



*Click image to enlarge*          *Click image to enlarge*

85.     After viewing the test or control stimuli and the Kettle Brand chips, respondents were directed to a new screen and asked which chips they would purchase. The question screen included a table containing images of the front of the chip bags, as well as information on product size and price. As with Dr. Dennis' survey, the chips were shown as the same size bag (8 oz.) and were described as having the same price.[68]

86.     Again, respondents could click the chip bag images to enlarge, which would allow them to view both the front and the back of the bags. Unlike Dr. Dennis, I also allowed respondents to indicate that they would not purchase either of the products shown. Figures 11 and 12 provide examples of how the referendum question could appear to a respondent. Further examples may be found in **Exhibit E**.

---

[68] The price was held constant across these products to mimic Dr. Dennis' survey. I am not asserting that these products are always priced equivalently in the real world.

**Figure 11: Screenshot of Referendum Exercise – Test**

Please select the chips you would purchase. *You may click images to enlarge.*



**Figure 12: Screenshot of Referendum Exercise – Control**

Please select the chips you would purchase. *You may click images to enlarge.*



43

87.     Respondents who selected "Would not purchase either product" or "Don't Know" completed the survey and were thanked for their time. Respondents who indicated that they would purchase one of the chip options were directed to a screen showing their selection and asked to confirm whether this was the bag they would purchase. Respondents either confirmed yes or no and completed the survey. After answering this question, respondents completed the survey and were thanked for their time.[69] Figure 13 provides an example of how this question could appear to a respondent. Further examples may be found in **Exhibit E**.

**Figure 13: Screenshot of Confirmation Question**



Thanks for your answer.

You said that you would purchase the product below.

Please confirm or not confirm that this is the product you would purchase.

○ Yes, I confirm
○ No, I do not confirm

---

[69] Of the 905 respondents who qualified for the survey, 5 did not confirm their responses. Of the 863 respondents who answered the Dennis Survey's referendum question, 4 did not confirm their responses. See *Dennis Report*, Attachment G.

# X.   REBUTTAL RESULTS

88.      A total of 905 respondents qualified and completed the survey, including 602 from California and 303 from Hawaii. I used the same screening questions as Dr. Dennis used for his survey, although my survey, unlike his, has a much more balanced age distribution. As noted above, 63.2 percent of Dr. Dennis' survey respondents were 50 years or older. I have seen no data and Dr. Dennis does not provide any data suggesting that the majority of kettle-style potato chip purchasers are 50 years or older. As shown below, 20.4 percent of my survey respondents are 50 years or older.

**Table 1: Age and Gender Comparison Between Rebuttal Survey and Dennis Survey**

| Age by Gender - Rebuttal Survey | | | | | | Age by Gender - Dennis Survey | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Male | | Female | | | | Male | | Female | |
| Age Group | Count | Percent | Count | Percent | | Age Group | Count | Percent | Count | Percent |
| 18-29 | 86 | 27.8% | 257 | 43.1% | | 18-29 | 16 | 4.4% | 58 | 11.6% |
| 30-39 | 74 | 23.9% | 138 | 23.2% | | 30-39 | 44 | 12.1% | 81 | 16.2% |
| 40-49 | 72 | 23.3% | 93 | 15.6% | | 40-49 | 58 | 16.0% | 61 | 12.2% |
| 50+ | 77 | 24.9% | 108 | 18.1% | | 50+ | 245 | 67.5% | 300 | 60.0% |
| **Total Respondents** | **309** | **100.0%** | **596** | **100.0%** | | **Total Respondents** | **363** | **100.0%** | **500** | **100.0%** |

Source: NERA Survey Data                                      Source: Dennis Data

89.      I can also compare the brands of chips purchased by my survey respondents with the brands purchased by Dr. Dennis' respondents. As shown below, the distribution of brands of chips purchased between my population and Dr. Dennis' population is essentially equivalent. Importantly, my survey respondents were just as likely as Dr. Dennis' respondents to have ever purchased the Hawaiian brand kettle-style chips (53.3 percent compared to 51.2). My survey respondents were in fact slightly more likely to be frequent purchasers of the Hawaiian brand – 16.4 percent of my respondents indicated that Hawaiian Kettle Style chips were the brand purchased most frequently compared to 14.5 percent of the respondents in Dr. Dennis' survey.

45

**Table 2: Brands Purchased Comparison Between Rebuttal Survey and Dennis Survey**

**Brands of Kettle Potato Chips Purchased in the Past 24 Months Rebuttal Survey**

| Kettle Chip Brand | Count | Percent |
|---|---|---|
| Lay's Kettle Cooked | 635 | 70.2% |
| Cape Cod Kettle Cooked Potato Chips | 406 | 44.9% |
| Hawaiian Kettle Style | 482 | 53.3% |
| Kettle Brand Potato Chips | 730 | 80.7% |
| Utz Kettle Classics | 94 | 10.4% |
| Wise Kettle | 65 | 7.2% |
| Deep River | 62 | 6.9% |
| **Total Respondents** | **905** | **100.0%** |

Source: NERA Survey Data

Note: Percent does not sum to 100 because respondents could select multiple answers.

**Brands of Kettle Potato Chips Purchased in the Past 24 Months Dennis Survey**

| Kettle Chip Brand | Count | Percent |
|---|---|---|
| Lay's Kettle Cooked | 618 | 71.6% |
| Cape Cod Kettle Cooked Potato Chips | 462 | 53.5% |
| Hawaiian Kettle Style | 442 | 51.2% |
| Kettle Brand Potato Chips | 687 | 79.6% |
| Utz Kettle Classics | 86 | 10.0% |
| Wise Kettle | 80 | 9.3% |
| Deep River | 52 | 6.0% |
| **Total Respondents** | **863** | **100.0%** |

Source: Dennis Data

Note: Percent does not sum to 100 because respondents could select multiple answers.

## A.     Preference Ranking Exercise

90.     Broadly speaking, a max-diff analysis compares the number of times respondents select a given descriptor as "most important" and "least important" in when considering kettle-style chips. To evaluate the importance of the different characteristics tested, I utilized a Hierarchical Bayesian (HB) analysis to determine the rank order of the fourteen descriptions tested. An HB analysis essentially allows the researcher to account for individual level preferences and responses and take these into account when formulating an overall estimate. This is a standard method to compute results from max-diff surveys.[70]

91.     As shown below in Table 3, respondents view price, flavor, brand, and package size as important characteristics. More than half of all survey respondents selected one of these items as "most important" in at least one of their preference sets. In stark contrast, and contrary to Dr. Dennis' survey results, 669 of 905 (74 percent) of respondents identified manufacturing

---

[70] Qualtrics, "MaxDiff Analysis White Paper" https://www.qualtrics.com/support/conjoint-project/getting-started-conjoints/getting-started-maxdiff/maxdiff-analysis-white-paper, accessed February 18, 2021.

location as the **least** important product attribute in even a single one of their preference sets, placing it last of the 14 attributes ranked.

### Table 3: Importance of Purchase Considerations

| Descriptor | Most Important | | Least Important | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| (a) | (b) | (c) | (d) | (e) |
| | | (b) / N | | (d) / N |
| Affordable price | 713 | 78.8 % | 112 | 12.4 % |
| Familiar flavor | 602 | 66.5 | 171 | 18.9 |
| Familiar brand | 572 | 63.2 | 173 | 19.1 |
| Package size | 484 | 53.5 | 252 | 27.8 |
| All natural | 422 | 46.6 | 156 | 17.2 |
| New flavor | 367 | 40.6 | 282 | 31.2 |
| Organic | 287 | 31.7 | 349 | 38.6 |
| Low or no salt | 248 | 27.4 | 319 | 35.2 |
| Low calorie | 243 | 26.9 | 363 | 40.1 |
| Low or no fat | 236 | 26.1 | 419 | 46.3 |
| Non-GMO | 193 | 21.3 | 418 | 46.2 |
| Gluten free | 100 | 11.0 | 636 | 70.3 |
| Manufacturing location | 79 | 8.7 | 669 | 73.9 |
| Kosher | 55 | 6.1 | 663 | 73.3 |
| **Total Respondents** | **905** | | **905** | |

Source: NERA Survey Data

92.       Using HB analysis to account for individual preferences, I can rank order the characteristics in terms of their relative importance. As with the count analysis presented above, price, flavor, brand and package size are the most important. Manufacturing location is again at

47

the bottom only deemed least important along with "Kosher." The preference scores and corresponding ranks are shown in Table 4 below.

**Table 4: Preference Scores and Rank Order**

| | | 95% Confidence Interval | |
| Descriptor | Average | Lower | Upper |
|---|---|---|---|
| (a) | (b) | (c) | (d) |
| Affordable price | 16.34 | 15.87 | 16.81 |
| Familiar flavor | 13.33 | 12.84 | 13.82 |
| Familiar brand | 12.63 | 12.15 | 13.12 |
| Package size | 10.39 | 9.90 | 10.88 |
| All natural | 9.48 | 9.01 | 9.95 |
| New flavor | 7.88 | 7.44 | 8.31 |
| Organic | 6.08 | 5.60 | 6.56 |
| Low or no salt | 5.30 | 4.92 | 5.67 |
| Low calorie | 5.00 | 4.62 | 5.38 |
| Non-GMO | 4.45 | 4.04 | 4.87 |
| Low or no fat | 4.38 | 4.02 | 4.74 |
| Gluten free | 2.21 | 1.90 | 2.52 |
| Manufacturing location | 1.46 | 1.24 | 1.69 |
| Kosher | 1.08 | 0.93 | 1.22 |

| | |
|---|---|
| **Total Respondents** | 905 |
| **Root Likelihood** | 0.491 |

Sources: NERA Survey Data; Exhibit I

93.     The results of the max-diff exercise demonstrate that manufacturing location is viewed as an unimportant feature by the vast majority of kettle-style chip purchasers. 74 percent of respondents view it as the least important product attribute and less than ten percent of

respondents *ever* indicate that manufacturing location is important. Overall, geographic location falls to the bottom-most of a rank ordered list of fourteen other characteristics consumers take into account when considering which kettle-style chip to purchase.

## B.    Revised Referendum Exercise

94.    The preference exercise establishes unequivocally that consumers do not view manufacturing location to be an important characteristic. To determine whether the specific at-issue label has any impact on consumer purchases, I analyze the results from my revised referendum exercise.

95.    As described above, I have corrected many of the flaws in Dr. Dennis' referendum exercise and can use these results to appropriately estimate the extent to which the product packaging relative to packaging which clearly states the product is not made in Hawaii would have an impact on consumer purchases.

96.    As shown in Table 5 below, there is no difference in purchasing intent between those shown the at-issue label and those shown a label which states "Not a Product of Hawaii" on the front of the package. A total of 40.5 percent of respondents shown the packaging Plaintiffs allege is misleading indicate this is their preferred product compared to 41.3 percent of respondents shown the package clearly indicating the product is not made in Hawaii. The net difference of -0.8 percent is not statistically significantly different.[71] These results demonstrate that whatever features of the chips affect consumers' interest in purchasing, it is *not* a belief that the product is made in Hawaii.

---

[71] Given that 184 of 458 test respondents and 183 of 447 control respondents selected that they would purchase Hawaiian Brand chips, the t-statistic for this proportion difference is approximately -0.2341, which is not statistically significant.

49

**Table 5: Chip Purchase Intent**

| Selection | Test Condition (Original Package) | | Control Condition (Enlarged Disclaimer) | | Net Difference | t-test |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Percent | Value |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| | | (b) / Σ (b) | | (d) / Σ (d) | (c) - (e) | |
| Product A (Hawaiian Brand) | 184 | 40.2 % | 183 | 40.9 % | -0.8 % | -0.2341 |
| Product B (Kettle Brand) | 263 | 57.4 | 247 | 55.3 | 2.2 | 0.6564 |
| Would not purchase either product | 10 | 2.2 | 9 | 2.0 | 0.2 | |
| Don't know | 1 | 0.2 | 8 | 1.8 | -1.6 | |
| **Total** | **458** | 100.0 % | **447** | 100.0 % | | |

Source: NERA Survey Data

# XI.   CONCLUSIONS

97.     Dr. Dennis' survey is completely divorced from a realistic purchasing context, assumes the importance of manufacturing location, and has no control for the numerous biases that undermine his results.  His biased survey offers no insight as to the importance (or lack thereof) of the origin of the chip relative to any other product features. Dr. Dennis does not ask respondents which factors influence their chip purchases and does not ask consumers to evaluate which product features actually matter in selecting a snack product to purchase.

98.     I have corrected many of the flaws in Dr. Dennis' survey and can use these results to appropriately estimate the extent to which the product packaging relative to packaging which clearly states the product is not made in Hawaii would have an impact on consumer purchases. The research I conducted stands in marked contrast to Dr. Dennis' survey. I find there is no difference in purchasing intent between those shown the at-issue label and those shown a label which states "Not a Product of Hawaii" on the front of the package. A total of 40.2 percent of respondents shown the packaging Plaintiffs allege is misleading indicate this is their preferred product compared to 40.9 percent of respondents shown the package clearly indicating the

50

product is not made in Hawaii. The net difference of -0.8 percent is not statistically significantly different.  These results demonstrate that whatever features of the chips affect consumers' interest in purchasing, it is not a belief that the product is made in Hawaii.

99.     Further, rather than ask biased questions, I designed a test to understand the importance consumers place (if any) on manufacturing location within the context of all of the other factors that might influence a purchase decision.  My results show respondents view price, flavor, brand, and package size as important characteristics. More than half of all survey respondents selected one of these items as "most important" in at least one of their preference sets. In stark contrast, and contrary to Dr. Dennis' survey results, 669 of 905 (74 percent) of respondents identified manufacturing location as the least important product attribute in even a single one of their preference sets, placing it last of the 14 attributes ranked.

100.    My opinions and conclusions as expressed in this report are to a reasonable degree of professional and scientific certainty. I may conduct additional analyses and offer additional tables or conclusions at trial based on information made available to me. My conclusions have been reached through the proper application of survey methods, and using standard methodologies relied upon by experts in the field of survey and market and consumer research. My opinions will continue to be informed by any additional material that becomes available to me. I reserve the right to update and or supplement my opinions if Plaintiffs provides additional information. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Dated February 19, 2021.

Sarah Butler, Managing Director