IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MICHAEL MAEDA and RICK SMITH, individually and on behalf of all others similarly situated, | ) ) ) ) | CIVIL NO. 18-00459 JAO-WRP<br><br>MEMORANDUM OF LAW IN SUPPORT |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| KENNEDY ENDEAVORS, INC., a corporation; and DOES 1 through 50, | ) ) ) | |
| Defendants. | ) ) | |
| | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| _____ | ) | |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................1

II. BOEDEKER'S FLAWED CONJOINT METHODOLOGY .........................2

III. STANDARD............................................................................................6

IV. ARGUMENT...........................................................................................7

    A.  The Assumption Underlying Boedeker's Entire Analysis Is Flawed. ........................................................................................7

    B.  Boedeker's Conjoint Analysis Cannot Measure Benefit-of-the-Bargain, Market-Based Damages Because He Has Improperly Failed to Consider Supply-Side Factors................................................9

        1.  Because Boedeker's Conjoint Analysis Is Based on a Consumer-Facing Survey, It Only Measures Willingness to Pay—Demand—and Cannot Provide Evidence of Benefit-of-the-Bargain Damages. ............................................11

        2.  Boedeker's Willingness-to-Pay Measure Cannot Be Converted to Market-Based, Benefit-of-the-Bargain Damages. ..................................................................................17

    C.  Boedeker's Conjoint Analysis Produces Unreliable Results. .............19

    D.  Boedeker's Conjoint Analysis Fails to Mimic Real-World Conditions. ..................................................................................22

    E.  Boedeker's Alternative Damages Measure Is Flawed and Unreliable. ...................................................................................23

V.  CONCLUSION........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-CV-01846, 2014 U.S. Dist. LEXIS 29721
(N.D. Cal. Mar. 6, 2014).................................................................11

*Beaty v. Ford Motor Co.*,
No. 17-cv-5201, 2020 U.S. Dist. LEXIS 23670
(W.D. Wash. Feb. 11, 2020)................................................... 10, 16

*Cholakyan v. Mercedes-Benz USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012)......................................................6

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004) .............................................................6

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..........................................................................24

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....................................................................6, 24

*Davidson v. Apple, Inc.*,
No. 16-cv-04942, 2018 U.S. Dist. LEXIS 137707
(N.D. Cal. May 7, 2018) ...................................................................1

*Davidson v. Apple, Inc.*,
No. 16-cv-04942, 2019 U.S. Dist. LEXIS 103624
(N.D. Cal. June 20, 2019) .................................................................1

*Davidson v. Apple, Inc.*,
No. 16-cv-04942, 2019 U.S. Dist. LEXIS 204426
(N.D. Cal. Nov. 22, 2019) .................................................................1

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2001) ............................................................6

*FDIC v. Van Dellen*,
  No. 10-cv-4915, 2012 U.S. Dist. LEXIS 195913
  (C.D. Cal. Nov. 6, 2012).................................................................................25

*In re 5-Hour Energy Mktg. & Sales Practices Litig.*,
  No. 13-ml-2438, 2017 U.S. Dist. LEXIS 220969
  (C.D. Cal. June 7, 2017) ..................................................................................6

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) .............................................................8

*In re Dial Complete Mktg. & Sales Practices Litig.*,
  320 F.R.D. 326 (D.N.H. 2017) ............................................................... 17, 18

*In re GM LLC Ignition Switch Litig.*,
  407 F. Supp. 3d 212 (S.D.N.Y. 2019) .................................................. passim

*In re GM LLC Ignition Switch Litig.*,
  427 F. Supp. 3d 374 (S.D.N.Y. 2019) .......................................................1, 10

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) .........................................................25

*In re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) ......................................................2, 5

*In re NJOY, Inc. Consumer Class Action Litig.*,
  No. 14-cv-428, 2016 U.S. Dist. LEXIS 24235
  (C.D. Cal. Feb. 2, 2016) ................................................................................10

*In re Seagate Tech. LLC Litig.*,
  No. 16-cv-00523, 2019 U.S. Dist. LEXIS 10234
  (N.D. Cal. Jan. 22, 2019) ................................................................................1

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab.
  Litig.*,
  No. 2672, 2020 U.S. Dist. LEXIS 211796 (N.D. Cal. Nov. 12, 2020) .........10

*Kilby v. CVS Pharmacy, Inc.*,
  No. 09-cv-2051, 2012 WL 1132854 (S.D. Cal. Apr. 4, 2012) .......................6

iii

*MacDougall v. Am. Honda Motor Co.*,
No. 17-cv-1079, 2020 U.S. Dist. LEXIS 166786
(C.D. Cal. Sep. 11, 2020) ..................................................................... passim

*Obrey v. Johnson*,
400 F.3d 691 (9th Cir. 2005) ...........................................................................6

*Saavedra v. Eli Lilly & Co.*,
No. 12-cv-9366, 2014 U.S. Dist. LEXIS 179088
(C.D. Cal. Dec. 18, 2014) .................................................................... 11, 13

*Schechner v. Whirlpool Corp.*,
No. 2:16-cv-12409, 2019 U.S. Dist. LEXIS 171642
(E.D. Mich. Aug. 13, 2019) .................................................................. 10, 16

*Schwab v. Commissioner*,
715 F.3d 1169 (9th Cir. 2013) ......................................................................12

*Townsend v. Monster Bev. Corp.*,
303 F. Supp. 3d 1010 (C.D. Cal. 2018) .............................................. 1, 8, 23

*Zakaria v. Gerber Prods. Co.*,
755 F. App'x 623 (9th Cir. 2018) ...............................................................9, 10

**Rules**

Fed. R. Evid. 702(a) .........................................................................................6

Fed. R. Evid. 702(b) .........................................................................................6

Fed. R. Evid. 702(c) .........................................................................................6

Fed. R. Evid. 702(d) .........................................................................................6

**Other Authorities**

Black's Law Dictionary (9th ed.)....................................................................12

MEMORANDUM OF LAW IN SUPPORT

## I.   **INTRODUCTION**

In an attempt to manufacture evidence of class-wide injury and damages resulting from a label that the Court has already ruled would not deceive a reasonable consumer as a matter of law, Plaintiffs turn to a discredited damages methodology (conjoint analysis) performed by an expert (Stefan Boedeker) whose conjoint analyses have been repeatedly rejected by the courts.[1]

In *Townsend v. Monster Beverage*, the court denied plaintiffs' motion for class certification in its entirety after finding Boedeker's conjoint analysis failed to include attributes deemed important purchase drivers to consumers—rendering his conjoint analysis "useless"—and failed to tailor his conjoint analysis to plaintiffs' theory of the case.  303 F. Supp. 3d at 1048-51.  In *In re GM LLC Ignition Switch Litigation* ("*General Motors*"), the court granted summary judgment in favor of the defendant, while simultaneously noting that Boedeker's testimony would have also

---

[1] *See*: (1) *MacDougall v. Am. Honda Motor Co.*, No. 17-cv-1079, 2020 U.S. Dist. LEXIS 166786 (C.D. Cal. Sep. 11, 2020); (2) *In re GM LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019); (3) *In re GM LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374 (S.D.N.Y. 2019); (4) *In re Seagate Tech. LLC Litig.*, No. 16-cv-00523, 2019 U.S. Dist. LEXIS 10234 (N.D. Cal. Jan. 22, 2019); (5) *Davidson v. Apple, Inc.*, No. 16-cv-04942, 2019 U.S. Dist. LEXIS 204426 (N.D. Cal. Nov. 22, 2019); (6) *Davidson v. Apple, Inc.*, No. 16-cv-04942, 2019 U.S. Dist. LEXIS 103624 (N.D. Cal. June 20, 2019); (7) *Davidson v. Apple, Inc.*, No. 16-cv-04942, 2018 U.S. Dist. LEXIS 137707 (N.D. Cal. May 7, 2018); and (8) *Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018).

been excludable under Rule 702, because Boedeker's analysis could not, as a matter of law, suffice as evidence of the type of benefit-of-the-bargain damages plaintiffs claimed since it only looked to consumers' willingness-to-pay and ignored the supply side of the market value equation.  407 F. Supp. 3d at 232-42. And in *MacDougall v. Am. Honda Motor Co.*, the court excluded Boedeker's "unreliable" and "flawed" report after determining Boedeker's conjoint analysis produced "absurd or illogical" results.  2020 U.S. Dist. LEXIS 166786, at *20-29.

The courts' pointed criticisms of Boedeker's analysis and methodology apply here and this Court should decisively reject Boedeker's testimony.

## II.   BOEDEKER'S FLAWED CONJOINT METHODOLOGY

"[I]n conjoint analysis, survey respondents are asked to make a series of choices between different combinations of product attributes. . . . Combining the responses to all of the choice sets, the analyst can then use established statistical methods to estimate the separate value (or part-worth) that consumers attach to each product attribute."  *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118-19 (C.D. Cal. 2015).  The "product attribute" Boedeker's conjoint survey purports to value is the "Origin" of the Hawaiian Brand Kettle Style Potato Chips at issue.  Boedeker Rpt. (Dkt. 96-33) at ¶ 163.

To conduct his conjoint analysis, Boedeker surveyed 501 respondents from all over the country who self-reported as having purchased or having considered

purchasing Hawaiian Brand Kettle Style Potato Chips or one of the potato chip products of "its closest competitor brands" within the previous three years.  (Dkt. 96-33) at ¶ 129.  Of those survey respondents, however, only 64 reported actually purchasing the chips at issue in Hawaiʻi and 165 reported actually purchasing the chips at issue in California, meaning less than half of survey respondents self-reported as putative class members.  *See* Boedeker Working Papers, attached to the Declaration of Andrew G. Phillips ("Phillips Decl.") as **Exhibit 15**.  In addition, nearly half of survey respondents had never heard of Hawaiian Brand Kettle Style Potato Chips.  Boedeker Dep. attached to the Phillips Decl. as **Exhibit 14** ("Boedeker Dep.") at 159:14-160:19.

Survey respondents were instructed to "[i]magine that [they] are at [their] local store considering the purchase of a 7.5 oz. bag of Hawaiian Kettle Style Potato Chips."  (Dkt. 96-33) at ¶ 148.  The survey respondents were then presented with a "choice menu" consisting of two potential Hawaiian Brand Kettle Style Potato Chips products to choose from—or, more accurately, two columns of six product attributes purportedly representing the chip products that randomly varied along different "levels" for each attribute:  (1) Origin (Levels: Made in Hawaii or Made in Washington State); (2) Gluten (Levels: Gluten free or Not gluten free); (3) Kosher (Levels: Kosher certified or Not Kosher Certified); (4) Flavor (Levels: Sweet Maui Onion, Luau BBQ, or Original); (5) either Reduced Fat (Levels:

Reduced Fat or Regular) or Organic (<u>Levels</u>: Organic or Not Organic);[2] and

(6) Price (<u>Levels</u>: $1.69, $2.39, $2.99, $3.99, or $4.99). *Id.* at ¶¶ 137, 143, 150.

Please indicate which of the given options you would select.

| | Option 1 | Option 2 |
|---|---|---|
| Origin ⓘ | Made in Hawaii | Made in Hawaii |
| Gluten ⓘ | Gluten free | Not gluten free |
| Kosher ⓘ | Kosher certified | Kosher certified |
| Fat Content ⓘ | Reduced fat | Regular |
| Flavor ⓘ | Luau BBQ | Sweet Maui Onion |
| Price ⓘ | $2.39 | $3.99 |
| Which option would you prefer? | ⦿ | ○ |

Boedeker purportedly selected the attributes to include in the survey "[b]ased on deposition testimony and documents, including images of actual packaging, received from Defendants through discovery." *Id.* at ¶ 137. However, certain of the attributes Boedeker selected for the Hawaiian Kettle Style Potato Chips do not exist in the market—e.g., there is no reduced fat version or organic version of these products. Boedeker Dep. at 179:4-181:5. For the price levels, Boedeker chose a range (from $1.69 to $4.99) based on third-party pricing data for the Hawaiian Kettle Style Potato Chips currently sold in the marketplace. *Id.* at 205:15-206:9.

_____

[2] Roughly half of the survey respondents were shown product profiles with the Reduced Fat attribute and the other half were shown product profiles with the Organic attribute. (Dkt. 96-33) at ¶ 137.

After presenting each respondent with 15 different two-product choice menus, (Dkt. 96-33) at ¶ 144, Boedeker used a software program called Sawtooth to estimate "part-worths" for each of the attributes included in the survey. Boedeker Dep. at 126:20-25.  These part-worths are a unit-less measure of the "value" consumers attach to each attribute relative to the other attributes.  *See id.* at 128:4-14; *In re NJOY*, 120 F. Supp. 3d at 1118-19.  Next, Boedeker used the part-worths to construct demand curves for the different combination of attributes. (Dkt. 96-33) at ¶¶ 175-79.  For each combination of attributes, Boedeker purportedly constructed demand curves for two hypothetical products where the levels of the attributes for the products (e.g., Gluten free, Kosher certified, Reduced fat, Luau BBQ) were all kept constant, except one product had the Made in Hawaii attribute level (the actual world demand curve) and one product had the Made in Washington State attribute level (the but-for world demand curve).  *Id.* at ¶¶ 179-81; Boedeker Dep. at 226:11-227:20.

Finally, Boedeker measured the vertical difference between the actual and but-for demand curves, calculated the difference in terms of a percentage, and then found that the average percentage price difference between a demand curve for the Made in Hawaii product versus Made in Washington State product is 9.17%.  *Id.* at ¶¶ 181-82.  Boedeker multiplied 9.17% times sales data to find purported class-wide damages.  *Id.* at ¶ 189.

### III.  STANDARD

"The Ninth Circuit has approved of a rigorous application of *Daubert* . . . in evaluating class certification motions."  *In re 5-Hour Energy Mktg. & Sales Practices Litig.*, No. 13-ml-2438, 2017 U.S. Dist. LEXIS 220969, at *6 (C.D. Cal. June 7, 2017) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2001)); *see also Cholakyan v. Mercedes-Benz USA, LLC,* 281 F.R.D. 534, 542 (C.D. Cal. 2012); *Kilby v. CVS Pharmacy, Inc.*, No. 09-cv-2051, 2012 WL 1132854, at *5 n.2 (S.D. Cal. Apr. 4, 2012).

*Daubert* requires that expert testimony is "relevant," "reliable," and "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 591 (1993); *see also* Fed. R. Evid. 702(a)-(d).  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Daubert*, 509 U.S. at 591.  Further, while mere "technical unreliability" goes to the weight accorded to a proffered methodology, "fatal flaws" require exclusion.  *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004); *see also Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005) (evidence should be excluded if it "suffer[s] from serious methodological flaws").

## IV.   ARGUMENT

### A.   The Assumption Underlying Boedeker's Entire Analysis Is Flawed.

Boedeker's entire conjoint analysis rests on a faulty assumption that renders the entire analysis unreliable, unhelpful, and irrelevant:  that 100% of consumers were deceived into believing that the Hawaiian Brand Kettle Style Potato Chips were made in Hawai'i.  Specifically, in Boedeker's conjoint survey, consumers were not presented with the packaging of the chips at issue and given the opportunity to draw their own conclusions about where the product was made. Rather, they were presented with an affirmative list of product attributes— including the "Origin" attribute, which was presented either as "Made in Hawaii" or "Made in Washington State."  (Dkt. 96-33) at ¶ 137.[3]

Boedeker then compared consumer demand for a chip product that affirmatively disclosed it was Made in Hawaii—represented by the so-called "actual" demand curve—versus a chip product that affirmatively disclosed it was Made in Washington State—represented by the "but-for" demand curve—and

---

[3] *See also* Boedeker Dep. at 218:13-22 ("Q: The consumer in your survey, though doesn't independently reach the conclusion of whether they think the packaging means the product is from Hawaii or Washington.  They are informed the product is either from Hawaii or Washington; correct?  A: That is correct, because I want to measure the value and attributes, and again I'm not an expert who measures how perceptions influence consumers.  That would be more like a marketing psychologist or somebody in that area.").

concluded that the difference in the consumer demand was the price premium attributable to Defendant's conduct.  *Id.* at ¶ 178; Boedeker Dep. at 75:8-16.  By representing the "actual world" with the demand curve where ***all*** survey respondents were told the product was Made in Hawaii, Boedeker's analysis thus assumes all consumers in the real world believe the chips were made in Hawai'i—an assumption contradicted by Plaintiffs' own evidence.[4]

Put differently, Boedeker's analysis measures the price premium attributable to consumers' preferences for a product actually made in Hawai'i versus a product actually made in Washington, not a price premium attributable to Plaintiffs' theory of liability—i.e., that the product packaging caused putative class members to believe that the products were manufactured in Hawai'i.  For that reason, Boedeker's analysis should be rejected from the outset.  *See, e.g.*, *Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1051 (C.D. Cal. 2018) (rejecting Boedeker's analysis where he failed to establish a common meaning for the representation at issue); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1023-24 (C.D. Cal. 2015) (rejecting plaintiffs' damages model where it calculated only the

---

[4] Even Plaintiffs' flawed survey evidence on consumer deception showed that not all consumers believed the product was manufactured in Hawai'i.  *See* (Dkt. 96-32) at ¶ 21 (Report of Plaintiffs' Expert J. Michael Dennis); Lemon Report at ¶ 118 (explaining that Dennis's flawed analysis still shows as much as 27.0% and 16.7% of purchasers in California and Hawai'i, respectively, do not believe these challenged products are made in Hawai'i based on their front label).

price premium attributable to the defendant's use of the challenged statement, rather than the portion of that premium attributable to plaintiffs' theory of liability that the "100% Natural" label caused class members to believe the products contained no GMO ingredients).[5]

### B. Boedeker's Conjoint Analysis Cannot Measure Benefit-of-the-Bargain, Market-Based Damages Because He Has Improperly Failed to Consider Supply-Side Factors.

As the Ninth Circuit recently explained, "plaintiffs can measure class-wide damages using methods that evaluate what a consumer would have been willing to pay for the product had it been labeled accurately"—like conjoint analysis—but such methods "must . . . reflect supply-side considerations and marketplace realities that would affect product pricing." *Zakaria v. Gerber Prods. Co.*, 755 F. App'x 623, 624 (9th Cir. 2018). Conjoint analyses, including conjoint analyses performed by Boedeker, have been routinely rejected by courts (particularly by those in this Circuit, and particularly as of late) for failing to do so:

- *MacDougall v. Am. Honda Motor Co.*, No. 17-cv-1079, 2020 U.S. Dist. LEXIS 166786, at *18 (C.D. Cal. Sep. 11, 2020) (striking Boedeker's analysis after noting that "district courts across the country have excluded choice-based conjoint analyses that fail to accurately account for supply-side

---

[5] While Boedeker refused to admit during his deposition that his conjoint analysis necessarily assumed that all consumers in the real world were deceived, he did concede that his analysis required that a "sufficient amount of consumers read the label in a sense that they were misled," but he never articulates what constitutes a "sufficient amount" or establishes that amount of consumers were actually deceived here. Boedeker Dep. 216:1-19.

considerations");

- *In re GM LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 236 n.12, 241, (S.D.N.Y. 2019), *reconsideration denied*, 427 F. Supp. 3d 374 (S.D.N.Y. 2019) (finding Boedeker's analysis could not prove "Plaintiffs suffered benefit-of-the-bargain damages based on a difference in value" because he did not properly account for supply-side factors);

- *Zakaria v. Gerber Prods. Co.*, No. 15-cv-00200, 2017 U.S. Dist. LEXIS 221124, at *57 (C.D. Cal. Aug. 9, 2017), *aff'd*, 755 F. App'x 623 (9th Cir. 2018) ("Plaintiff has failed to show that the methodology employed by Howlett sufficiently accounted for the actual price of [the relevant product] . . . . The conjoint analysis is [thus] not sufficiently tethered to actual market conditions, including pricing[.]");

- *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672, 2020 U.S. Dist. LEXIS 211796, at *20 (N.D. Cal. Nov. 12, 2020) ("[S]everal aspects of Mr. Gaskin's analysis stand out as flawed even to the untrained eye.  Each provides an independent reason to exclude the evidence as unreliable.  First, Mr. Gaskin does not actually calculate a market price premium; he examines only what consumers say they would be willing to pay for certain vehicles.  As Defendants point out, this ignores the 'supply' part of the supply/demand curve.");

- *Beaty v. Ford Motor Co.*, No. 17-cv-5201, 2020 U.S. Dist. LEXIS 23670, at *19 (W.D. Wash. Feb. 11, 2020) ("In short, a conjoint analysis that does not (and perhaps cannot) account for factors in a functioning marketplace other than consumers' willingness to pay is not competent evidence of the quantum of damages. . . .[T]he better-reasoned cases reject the sort of damages calculations that Beaty's expert proposes.");

- *Schechner v. Whirlpool Corp.*, No. 2:16-cv-12409, 2019 U.S. Dist. LEXIS 171642, at *20 (E.D. Mich. Aug. 13, 2019) ("[Plaintiffs' expert] Weir failed to incorporate supply-side considerations into his calculated price of the 'Partial-Clean' ovens. . . . Because Weir failed to account sufficiently for the market conditions in which a 'Partial-Clean' oven would be sold, his conjoint analysis also fails the requirements of *Comcast*.");

- *In re NJOY, Inc. Consumer Class Action Litig.*, No. 14-cv-428, 2016 U.S. Dist. LEXIS 24235, at *21-22 (C.D. Cal. Feb. 2, 2016) ("Because Dr. Harris's

. . . conjoint analysis . . . continue[s] to focus on a consumer's subjective valuation, and thus do[es] not permit the court to calculate the *true market price* of NJOY cigarettes absent the purported misrepresentations and omissions, [it warrants exclusion.]");

- *Saavedra v. Eli Lilly & Co.*, No. 12-cv-9366, 2014 U.S. Dist. LEXIS 179088, at *14 (C.D. Cal. Dec. 18, 2014) (excluding conjoint analysis because the expert's model "look[ed] only to the demand side of the market equation . . . [and] convert[ed] the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants[]"); and

- *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2014 U.S. Dist. LEXIS 29721, at *79 (N.D. Cal. Mar. 6, 2014) ("[T]he survey leaves the Court with no way to compare Dr. Hauser's willingness to pay metrics—which relate only to demand for the patented feature—to the market price of the infringing devices, which reflects the real-world interaction of supply and demand for infringing and noninfringing devices.").

### 1. Because Boedeker's Conjoint Analysis Is Based on a Consumer-Facing Survey, It Only Measures Willingness to Pay—Demand—and Cannot Provide Evidence of Benefit-of-the-Bargain Damages.

In *General Motors*, the court in a 44-page order precisely why Boedeker's conjoint analysis failed to adequately account for supply-side factors and why that failure could not prove that plaintiffs suffered the type of benefit-of-the-bargain damages based on a difference in value they sought to recover. 407 F. Supp. 3d 220-42.[6] In short, the *General Motors* court explained:

(1)     Benefit-of-the-bargain damages—i.e., damages based on the theory that plaintiffs overpaid for a product based on the defendant's alleged conduct—

---

[6] Moreover, although the court ultimately granted summary judgment for the defendant, the court took care to note that Boedeker's testimony "would [also] be excludable under Rule 702." *Id.* at 236 n.12.

are measured as the difference between the fair market value of the product as represented (i.e., the product in the actual world plaintiffs thought they were receiving) and the fair market value of the product as sold (i.e., the product in the but-for world). 407 F. Supp. 3d at 231, 234.

(2)  That means plaintiffs seeking such damages must produce evidence of the market value of the product actually received (given that the market value of the product as represented can be objectively determined based on the price plaintiffs actually paid in the marketplace). *Id.* at 232.

(3)  Finally, and perhaps most significantly, market value is determined by the interaction of both **supply** and **demand**. *Id.* at 233; *see also Schwab v. Commissioner*, 715 F.3d 1169, 1178 (9th Cir. 2013) (explaining market value is understood to be "the point at which supply and demand intersect" (citing Black's Law Dictionary (9th ed.))).

The problem with Boedeker's analysis in *General Motors*, as here, is that he "focuses only on changes to the demand side of the equation. That is, he calculated only how *consumers' willingness to pay* would be affected by the disclosure of the defects at issue" in the but-for world in *General Motors* (or the disclosure that the Hawaiian Brand Kettle Style Potato Chips were made in Washington in the but-for world here).[7] 407 F. Supp. 3d at 235; *see also* (Dkt. 96-33) at ¶ 15 (explaining that the Choice Based Conjoint Analysis tool he uses quantifies "the impact of a product's attributes on consumers' choices and willingness-to-pay"). Willingness-to-pay cannot provide a measure of market-

---

[7] "Willingness to pay" is the highest price a consumer is willing to pay for a product. Boedeker Dep. 91:2-10. The traditional Econ 101 "demand curve" is constructed from the willingness to pay of the consumers in the market for a good. *Id.* at 91:22-92:10; Lemon Report at ¶¶ 141-42.

value-based damages because willingness-to-pay is a measure of demand, untethered to supply, and market value "is determined by the interaction of *both* supply *and* demand." 407 F. Supp. 3d at 233. In fact, there is "no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market." *Saavedra*, 2014 U.S. Dist. LEXIS 179088, at *14.

The conclusion that Boedeker's conjoint analysis focuses only on willingness-to-pay is inescapable because the data obtained and then inputted into his conjoint analysis to derive a supposed price premium comes only from respondents who indicated whether they would be willing to buy Product A or Product B when presented with a two-product choice task—that data can only reflect what consumers are willing to pay. Courts have overwhelmingly recognized that a conjoint analysis is only capable of measuring willingness-to-pay, and not market price.[8]

Boedeker admits he never measured Defendant's willingness-to-sell (i.e., the supply-side of the market value equation) or factored that into his analysis. He

---

[8] *See, e.g.*, *Saavedra*, 2014 U.S. Dist. LEXIS 179088, at *12 ("Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes—often called the market's willingness to pay"); *Zakaria*, 2017 U.S. Dist. LEXIS 221124, at *62, *aff'd*, 755 F. App'x at 624 (finding conjoint analysis only provided information about plaintiffs' "potential willingness to pay a premium due to the use of the . . . Label [and was] insufficient to establish a basis for calculating either restitution or actual damages").

testified that obtaining data on Defendant's willingness-to-sell "would have required a different study" and "wasn't [in Boedeker's] scope of work," so he "did not take those steps."  Boedeker Dep. 145:7-13.  Likewise, in *General Motors*, "Boedeker straightforwardly admit[ted] that he did not inquire into New GM's willingness to sell."  407 F. Supp. 3d at 235.  Boedeker's reports here and in *General Motors* "explicitly assume[] that the supply curve — that is, the range of prices at which New GM would be willing to sell any given quantity of defective cars [or Defendant would be willing to sell any given quantity of chips affirmatively disclosed as made in Washington] — would remain unchanged in the 'but-for' world in which those defects were fully disclosed [or the chips' place of origin was fully disclosed]." 407 F. Supp. 3d at 235; (Dkt. 96-33) at ¶ 61 ("I do not consider changes to the supply and . . . consider that the supplied volume is the same in the But-For-World as in the Actual-World").

In other words, rather than model a but-for world where supply and demand both reflect the fact that Defendant has fully disclosed that the chips at issue were manufactured in Washington rather than Hawaiʻi, Boedeker models a but-for world where demand changes but supply remains the same.  Not only is Boedeker's assumption that supply would remain the same in the but-for world (where Defendant fully disclosed that the chips were made in Washington state and, as a result, consumers are supposedly not willing to pay as much for them)

"'fundamentally flawed' because it would 'mean that a given product is supplied by the manufacturer in the same quantity no matter what the price is," Boedeker simply is not measuring **market value** in the but-for world as a matter of law, economics, and common sense if he is not looking at the intersection of but-for demand and but-for supply.[9]  407 F. Supp. 3d at 239-40; *see* Expert Rpt. of Andrew Lemon ("Lemon Rpt.") at ¶¶ 158-178.  Tellingly, he cites no economic treatise to support his flawed assumption.

The only other way in which Boedeker purports to have accounted for supply in his conjoint analysis is by choosing prices that actually prevailed in the marketplace for the chips, which he claims already reflect supply-factors.[10]  But those prices are prices from the actual world—which would, at best, reflect actual supply—not prices from the but-for world—which would reflect but-for supply.

---

[9] *General Motors*, 407 F. Supp. 3d at 239 (noting that such an assumption would imply (perfectly) inelastic supply).  Boedeker acknowledged at his deposition that potato chips do not have an inelastic supply curve. Boedeker Dep. at 95:25-97:6.

[10] Lest Plaintiffs attempt to claim otherwise, Boedeker did not somehow otherwise consider or account for supply in any other manner in his report.  Specifically, Boedeker did not look at any data related to Defendant's cost structure in manufacturing the chips, did not analyze any of Defendant's cost data, did not account for Defendant's profit margin on the chips at various prices or determine whether Defendant would be willing to sell at any given price, did not know the shape of Defendant's supply curve, and did not incorporate any data on Defendant's competitors into his calculations.  Boedeker Dep. at 145:14-17, 145:18-25, 146:1-9, 146:10-13, 236:18-20.  Moreover, he disclaims accounting for supply factors in any manner other than assuming supply is the same in the but-for and actual worlds and using historical prices. *Id.* at 147:3-18.

Using the prevailing prices in the market for apples does not provide any information on the market prices of oranges or reflect supply-side considerations in the market for oranges.  Or, as explained by another court:

> [Plaintiffs' expert] Weir did not adequately address . . . supply-side considerations.  He unconvincingly recited suppliers' statements about the competitive importance of prices and relied upon *historical retail sales and market data* as his supply-side considerations. . . . But that was insufficient for his conjoint analysis exercise to be tailored to Plaintiffs' damages theory. . . . [H]istorical transactions reflect only historical supply-side factors, not what the 'prevailing market conditions would have been absent the alleged wrongful conduct.' . . . *Weir needed to estimate both historical prices <u>and</u> the prices absent the alleged conduct, but he failed to do the latter appropriately*.

*Schechner*, 2019 U.S. Dist. LEXIS 171642, at *20 (emphasis added); *Beaty*, 2020 U.S. Dist. LEXIS 23670, at *18-19 ("[A] conjoint survey purporting to use sales figures from the 'actual world' cannot adequately account for changes in supply in the 'but for' world.").

In sum, Boedeker's analysis at most only provides evidence of what consumers would have been **<u>willing to pay</u>** had the products affirmatively stated they were made in Washington, but what he needed to measure was the **<u>market value</u>** of the products had they affirmatively stated they were made in Washington. "In the absence of evidence concerning [Defendant's] willingness to sell"—which would be necessary to calculate market value—"Boedeker's testimony would not assist the jury in determining any fact in issue" and is "excludable under Rule 702."  407 F. Supp. 3d at 236 n.12.

### 2. Boedeker's Willingness-to-Pay Measure Cannot Be Converted to Market-Based, Benefit-of-the-Bargain Damages.

Proponents of conjoint analysis attempt to obfuscate the issues in claiming their methodology based on the results of a consumer-facing survey actually accounts for supply. ***First***, Plaintiffs may refer to Boedeker's "market simulations" to imply that a "market simulation" must provide a "market value." But those "market simulations" have nothing to do with a market in the sense of an exchange between buyers and sellers, reflecting supply and demand. Instead, Boedeker measures the vertical difference between two ***demand*** curves. He does not model a supply curve, account for Defendant's costs of production, or introduce any competing products into that "market." (Dkt. 96-33) at ¶¶ 175-79. As such, the "market simulators" do not magically turn consumer demand into market value.

***Second***, Plaintiffs cannot fall back to *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 335-37 (D.N.H. 2017) to falsely equate Boedeker's conjoint analysis with measuring a phantom marginal consumer's willingness-to-pay to calculate market value. That analysis is misguided. Although a marginal consumer's willingness-to-pay does equal price, the marginal consumer can only be identified by first finding the intersection of supply and demand. Boedeker Dep. at 97:21-98:25 ("[W]ithout . . . knowing the market price

of a product I don't know what the marginal consumer is.").[11]  Boedeker does not find that intersection here and does not know who the marginal consumer is.

**Third**, Plaintiffs may point to the *General Motors* court's explanation that sometimes in a "classic mislabeling case" supply factors could be accounted for by using the prices and quantities of products sold in the actual marketplace.  "A conjoint survey that asks respondents whether they would rather pay x for a product labeled '100% Fruit Juice' or y for a similar product labeled '50% Fruit Juice,' for example, would account for supply-side factors if both x and y reflect the prices for which juice companies actually sell similarly labeled products in the marketplace."  407 F. Supp. 3d at 239.

That analysis makes some intuitive sense when there is a product sold in the real world that could serve as a proxy for the but-for world for the mis-labeled product:  if what the conjoint is intending to measure is what the market value of the 100% juice would have been if the defendant had disclosed it was actually 50% juice, real world data *for the 50% juice* could be theoretically relevant.  But here, Boedeker did not identify any such product that could serve as a proxy for the but-for world and instead looked to prices and volumes sold for the product at issue in the actual world.

---

[11] The court in *Dial* freely admitted that it was "difficult to follow" the expert reports and testimony on conjoint, coincidentally submitted in that case by Boedeker, which may explain its flawed analysis.  320 F.R.D. at 335.

***Fourth***, Plaintiffs may attempt to distance themselves from Boedeker's analysis in *General Motors* and may even claim there are substantive differences between his analysis in that case and this case. But during Boedeker's deposition, he confirmed he used the same conjoint framework in this case as in *General Motors*. Although *General Motors* was about "different defects," "what that study had in common is [Boedeker] used choice-based conjoint" as in this case, which "starts with calculating the part-worth that gives you a sense of the utility of certain attributes and then [performing] market simulations and look[ing] at difference of demand curves as the measure of economic loss. So, at that high level it's the same methodology." Boedeker Dep. at 242:11-243:1.[12]

## C.   Boedeker's Conjoint Analysis Produces Unreliable Results.

In *MacDougall v. American Honda Motor Co.*, the court recently struck Boedeker's expert report on conjoint analysis because in addition to its "inadequate and inaccurate accounting for supply-side considerations," Boedeker's conjoint

---

[12] Boedeker may already be trying to distance himself from the *General Motors'* rejection of his fundamentally flawed report. In this case, his report in this case generally avoids using the phrase "willingness-to-pay," includes a paragraph attempting to disclaim that he is calculating willingness to pay, and introduces a new "economic framework" that also purposefully avoids using "illustrative" supply curves as he had in other reports. However, Boedeker testified that there is "not a different economic theory" behind his conjoint analysis in this case and others, like *General Motors*. Boedeker Dep. 101:6-11. Moreover, as explained by Dr. Lemon, the new framework Boedeker employs is inapt for this case because it assumes a single seller with the ability to set prices for the product it sells. Lemon Report ¶ 166.

analysis "was conducted in a manner that undermines its reliability," leading to "absurd or illogical" results.  2020 U.S. Dist. LEXIS 166786 at *20-29.

There, Boedeker's conjoint analysis purported to measure the reduction in value of Honda Odyssey vehicles due to an alleged transmission defect.  In looking at the individual survey responses to Boedeker's conjoint analysis—which he attempted to carefully mask, as he does here, by presenting his results using aggregates and averages[13]—defendant's expert showed "a remarkable 55.4% of individual responses reflected economically irrational choices as to either price levels, the presence of defects, or both."  *Id.* at *23-24.  For example:

> Sawtooth calculated that one respondent's choices indicated a willingness to pay three million dollars more for a vehicle with a defect than for a vehicle without the alleged transmission defect. . . . In the case of another respondent, Sawtooth calculated a willingness to pay ten million dollars more for a vehicle without the alleged transmission defect than a vehicle with the alleged transmission defect. . . . Altogether, the irrationality exhibited in individual survey responses evidences a deeply flawed conjoint study that produced unreliable results unreflective of actual WTP [willingness to pay].

It then criticized Boedeker's attempt to hide these significant flaws and irrational survey responses by aggregating and averaging data, because doing so "gives an inaccurate impression of respondents' WTP because most of the underlying individual responses vary dramatically" from Boedeker's results.  *Id.* at *25-26.

---

[13] *See* (Dkt. 96-33) at ¶ 115 (remarking that "it could be tempting to estimate economic loss at the individual level," while unironically conceding that "[s]uch analysis will provide unreasonable results and would not be reliable").

Here, Boedeker's analysis fares no better.  At the outset, during screening questions, 34 of the 165 respondents (21%) who indicated that they purchased the Hawaiian Brand Kettle Style Chips at issue while living in California also reported that they had never heard of Hawaiian Brand Kettle Style Chips; 16 of the 64 (25%) respondents indicating that they purchased the Hawaiian Brand Kettle Style Chips at issue while living in Hawai'i likewise responded that they never heard of the product.  Phillips Decl., Ex. 15 (Boedeker Working Papers).  Faced with this glaring inconsistency during his deposition—indicating that one-fourth of the relevant survey respondents were providing irreconcilable answers to the **screening questions** before even beginning the survey—Boedeker responded "I don't have an explanation."  Boedeker Dep. at 165:18-166:3.

The irrational and inexplicable responses continued in the substantive portion of the conjoint survey.  Boedeker's conjoint analysis found, for example, that the **majority** of respondents who self-report as having purchased the challenged products while living in California or Hawai'i during the class periods (**62.2%** and **61.8%**, respectively), **prefer higher prices rather than lower prices** over some range of the prices he examined.  Lemon Report at ¶ 204.  Recognizing that such preferences over prices are not rational, Boedeker took the egregious step of manually intervening in Sawtooth to impose a "monotonicity constraint" that ensures his estimates of respondents' preferences over prices accord with basic

economic principles.  Boedeker Dep. at 238:5-12.  But by imposing that constraint, Boedeker fundamentally altered the preferences of his conjoint analysis estimates for the *other* product attributes in the survey.  As Defendant's expert Dr. Lemon explains:

> [C]omparing the "monotonicity constrained" preferences to their unconstrained counterparts finds that Mr. Boedeker's manual intervention changes individual respondents' estimated preferences from preferring made-in-Hawai'i potato chips to preferring made-in-Washington-State potato chips and at the same time changes other individual respondents' preferences from preferring made-in-Washington-State potato chips to preferring made-in-Hawai'i potato chips.  In the aggregate, preferences over where potato chips are made *flip* for 20.1% and 15.6% of respondents who self-report as having purchased the challenged products while living in California or Hawai'i during the class periods, respectively.

Lemon Report ¶ 205.  In other words, Boedeker's entire analysis is tainted by the constraint he imposed to counter-balance the economically irrational choices consumers made in his survey—preferring higher prices to lower prices—which directly affected the variable Boedeker was attempting to study (preference for Made in Hawaii over Made in Washington).  Like the court in *MacDougall*, the Court here should throw out these "tainted" and "economically irrational" results.

### D.   Boedeker's Conjoint Analysis Fails to Mimic Real-World Conditions.

A Boedeker conjoint analysis was previously excluded for failing to "include attributes deemed important purchase drivers by respondents [which] artificially inflates the importance of and drew undue attention to the limited

attributes presented to respondents in the conjoint analysis." *Townsend*, 303 F. Supp. 3d at 1049. Boedeker's analysis suffers the same flaw here: Boedeker does not account for important real-world attributes that drive purchasing decisions for potato chips, like the brand of the challenged products, brands of competing products, flavors of competing products, bag size, texture, or the environmental-friendliness of potato chips and how it differs depending on where the potato chips are made. Lemon Report at ¶¶ 41-43, 187-200. Boedeker performed no independent analysis to determine if the attributes he selected for his survey were actually important to consumers, and included attributes that even he admitted are not relevant to most of the consuming public, like kosher certification.[14] Defendant's expert Sarah Butler *did* perform a survey to determine which attributes potato chip consumers care about and confirmed that attributes Boedeker selected (gluten free, kosher, and—critically—manufacturing location) were all among the attributes consumers cared least about. Butler Report at ¶¶ 90-93.

### E.   Boedeker's Alternative Damages Measure Is Flawed and Unreliable.

In addition to his conjoint analysis, Boedeker also offers an "alternative damage measure" where he simply compared the challenged products' average prices to those of various groups of other products without any consideration of

---

[14] Boedeker Dep. at 194:8-14 (confirming he did not conduct a survey beforehand to determine the characteristics consumers actually care about), 183:22-184:10.

other factors.  (Dkt. 96-33) at ¶¶ 183-88.  Boedeker's so-called "price premium" for the Hawaiian Brand Chips does not differentiate between premia that arise from the alleged misconduct versus from legitimate factors (e.g., the challenged products' superior flavor, distribution costs, etc.).  Lemon Report at ¶¶ 47, 207-208.

Indeed, Boedeker recognizes this deficiency in his own analysis.  According to Boedeker, "[a] hedonic pricing analysis *could* build on the IRi scanner data to determine whether this price premium is due to Defendants' perceived connection to Hawaii or other tangible factors."  (Dkt. 96-33) at ¶ 186 (emphasis added).  However, he has not undertaken any such analysis of the retail transaction data available to isolate the effect of the alleged misconduct on these so-called price premiums.

As a result, having failed to reliably show that the supposed "price premiums" for the Hawaiian Brand Kettle Style Chips are actually attributable to the conduct Plaintiffs challenge in this lawsuit, as opposed to "other tangible factors," the Court should disregard this evidence, which:  (1) does not "measure only those damages attributable" to Plaintiffs' theory of harm as required at the class certification stage under *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); and (2) is not "relevant," "reliable," or "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute" under *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 589, 591 (1993); *see also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012) (noting the "key question regarding the admissibility" of a statistical analysis is whether it accounted for the "major factors" that influence the variable being studied—like the "other tangible factors" Boedeker ignores).

In any event, during his deposition, Boedeker apparently walked back this "alternative damage measure," contending "it's really a validation" of his conjoint analysis and not a "full blown" damages methodology.  Boedeker Dep. at 244:3-19 (further testifying, "I don't know that it could be turned, with more analysis, from a consistency or a validity check into a full blown damages method.").  To the extent Plaintiffs do attempt to turn this "validity check" into a "full blown damages model" with their reply papers, the Court should strike that analysis as untimely. *See, e.g.*, *FDIC v. Van Dellen*, No. 10-cv-4915, 2012 U.S. Dist. LEXIS 195913, at *4 (C.D. Cal. Nov. 6, 2012) (striking expert report that included "new and deeper analysis aimed at strengthening the opinions expressed in the original expert report").

## V.   <u>CONCLUSION</u>

For the reasons explained above and any adduced at a hearing, Boedeker's testimony and report should be excluded.

DATED:  Honolulu, Hawaiʻi, February 22, 2021.

/s/ David J. Minkin
DAVID J. MINKIN
JESSE J. T. SMITH
ANGELA M. SPIVEY (*pro hac vice*)
ANDREW G. PHILLIPS (*pro hac vice*)
JAMIE S. GEORGE (*pro hac vice*)

Attorneys for Defendant
KENNEDY ENDEAVORS, INC